Exhibit B

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
S. Bagnall, Deputy
2/9/2015 11:35:00 PM
Filing ID 6395474

1  Barbara J. Forde (013220)
   BARBARA J. FORDE, P.C.
2  20247 N. 86th Street
   Scottsdale, AZ  85255
3  BarbaraJForde@gmail.com
   *Attorney for Plaintiff*

4

5              **SUPERIOR COURT OF ARIZONA**

6                  **MARICOPA COUNTY**

7  KATRINA PERKINS STEINBERGER,
   as Executor of the Estate of Charles A.       No. CV2010-054539
8  Perkins, deceased, and individually,
                                                  **SECOND AMENDED COMPLAINT**
9              Plaintiff,
                                                  **TO VACATE SUBSTITUTIONS OF**
10     v.                                         **TRUSTEE, ASSIGNMENTS OF DEED**
                                                  **OF TRUST, and NOTICE OF**
11 INDYMAC MORTGAGE SERVICES, a                   **TRUSTEE'S SALE; VIOLATION OF**
   division of ONEWEST BANK, F.S.B., a            **A.R.S. § 33-420; BREACH OF**
12 Federally   Chartered   Savings   Bank;        **CONTRACT; BREACH OF DUTY OF**
   DEUTSCHE    BANK    NATIONAL                    **GOOD FAITH AND FAIR DEALING;**
13 TRUST COMPANY, as Trustee of the               **NEGLIGENT PERFORMANCE OF**
   INDYMAC INDX MORTGAGE LOAN                      **UNDERTAKING; NEGLIGENCE PER**
14 TRUST    2005-AR14;    MORTGAGE                 **SE; UNCONSCIONABLE**
   ELECTRONIC    REGISTRATION                      **CONTRACT/CONDUCT;**
15 SYSTEMS,    INC.,   a   Delaware                **DISCHARGE/PAYMENT**
   Corporation;    OCWEN     LOAN
16 SERVICING, LLC, a Limited Liability
   Company; KEELEY KRISTINE SMITH,                 (Assigned to the Honorable
17 an Attorney licensed with the Arizona              Thomas LeClaire)
   State Bar; JOHN AND JANE DOES 1-
18 1000,  XYZ  CORPORATIONS  1-15;
   ABC    LIMITED    LIABILITY
19 COMPANIES 1-15; and 123 BANKING               **JURY TRIAL DEMANDED**
   ASSOCIATIONS 1-15,

20

21             Defendants.

22

23         Plaintiff Katrina Perkins Steinberger, for her Second Amended Complaint against

24 the Defendants, alleges as follows:

25                  **PARTIES, JURISDICTION AND VENUE**

26     1.    Charles Perkins purchased the property at 9927 North 47th Place, Phoenix, Arizona

27 85028 ("the Property") on May 25, 2005.  Plaintiff lived at the property with Mr. Perkins,

28 Plaintiff's father, since he purchased the property.  Plaintiff is the executor of Mr. Perkins

1  estate, inherited the property from her father after his death in December, 2007 and has

2  been the owner in possession since that time.  Plaintiff is a resident of Maricopa County,

3  Arizona.

4      2.    Venue is proper in this Court, as the Property is located within its jurisdiction in

5  Maricopa County, Arizona, and because Plaintiff is still in possession of the Property,

6  more fully described as:

7          LOT 80, RANCHO ALTA VIDA, A SUBDIVISION RECORDED IN BOOK 174

8  OF        MAPS, PAGE 10, RECORDS OF MARICOPA COUNTY, ARIZONA.

9

10     3.        At the time of the loan's origination, IndyMac Bank F.S.B ("IndyMac

11 Bank"), listed as the Lender on the loan documents, was a Federally Chartered Savings

12 Bank.  On July 11, 2008, IndyMac Bank was closed by the Office of Thrift Supervision

13 (the "OTS"), and the Federal Deposit Insurance Corporation (the "FDIC") was named

14 Conservator.  The FDIC established IndyMac Federal Bank, FSB ("IndyMac Federal"), for

15 the conservatorship, and transferred substantially all of IndyMac Bank's mortgage loan

16 servicing portfolio and operations to IndyMac Federal.

17     4.        The FDIC determined that IndyMac Federal could not be saved, put it into

18 conservatorship, and began liquidation of IndyMac Federal.  On March 18, 2009, the FDIC

19 as Conservator for IndyMac Federal, entered into a Master Purchase Agreement with IMB

20 HoldCo LLC, and OneWest Bank Group LLC, a wholly owned subsidiary of HoldCo.

21 Pursuant to the Master Purchase Agreement, OneWest Bank Group LLC formed a new

22 federally chartered, FDIC insured, stock form savings association or savings bank known

23 as OneWest Bank, FSB ("OneWest Bank").   OneWest Bank was formed as a Pasadena,

24 California-based federal savings bank.  OneWest Bank's principal place of business is 888

25 E. Walnut, Pasadena, California, 91101.

26     5.  On March 19, 2009, OneWest Bank purchased from the FDIC as Conservator of

27 IndyMac Federal, assets of IndyMac Federal including but not limited to its servicing

28

2

1  advances and servicing rights with respect to certain mortgage loans, and substantially all
2  of IndyMac Federal's residential mortgage loan portfolio.

3      6.      According to the FDIC, litigants are barred from suing any entity over which
4  the FDIC acts as conservator or receiver, pursuant to 12 U.S.C. § 1821(j).  This bar
5  includes not only the assertion of claims for damages, but also the seeking of injunctive or
6  any other affirmative relief.  In addition, on November 19, 2009, the Board of Directors of
7  the FDIC determined that insufficient assets existed in the conservatorship/receivership of
8  IndyMac Bank, and the conservatorship/receivership of IndyMac Federal, to make any
9  distribution to unsecured creditors, and therefore such claims have no value.  For these
10  reasons, Plaintiff removed IndyMac Bank and IndyMac Federal as defendants in this
11  lawsuit.  If the FDIC's assertions are determined to be incorrect, or it is discovered that
12  Plaintiff must sue IndyMac Bank and/or IndyMac Federal in order to be entitled to any
13  relief she seeks, Plaintiff will seek to amend and rejoin IndyMac Bank/IndyMac Federal as
14  defendants in this matter.

15      7.      Any entity which is the transferee or holder of the Note, or the assignee of
16  the Deed of Trust, is subject to any and all affirmative claims and/or defenses the Plaintiff
17  could have asserted against IndyMac Bank as the originator of the loan, and IndyMac
18  Federal as an entity allegedly in the chain of title.

19      8.      IndyMac Mortgage Services, a division of OneWest Bank, ("IndyMac
20  Mortgage"), has been the servicer of the Note.  Even though IndyMac Mortgage
21  transferred its servicing rights in the loan to Ocwen Loan Servicing, LLC effective
22  December 1, 2013, OneWest Bank still purports to retain control over this litigation.

23      9.      Deutsche Bank National Trust Company ("DBNTC"), as Trustee of the
24  IndyMac INDX Mortgage Loan Trust 2005-AR14 (the "Trust"), is a special purpose
25  national banking association, formed under the laws of the United States of America,
26  whose business is limited to that of a trust company.  The Trust is governed by, among
27  other documents, a Pooling and Servicing Agreement ("PSA") dated June 1, 2005.

28

10.     Defendant Mortgage Electronic Registration Systems, Inc., ("MERS") is a Corporation formed under the laws of the state of Delaware.  MERS is listed as the Beneficiary in the Deed of Trust, and "is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns."

11.     Defendant Ocwen Loan Servicing, LLC, took over the servicing of the Loan from IndyMac Mortgage as of December 1, 2013.

12.     Keeley Kristine Smith is an Arizona attorney who was substituted as Trustee under the Deed of Trust on August 14, 2012, as on record at the Maricopa County Recorder's Office at Doc. No. 2012-0744352.  At the time of substitution, Trustee Smith was then employed by Quarles & Brady LLP; the State Bar of Arizona website states she is now with American Realty Capital Properties, Inc., which is not registered with the Arizona Corporation Commission.

13.     At present, no trustee's sale is pending, but Defendants have stated an intent to re-notice a trustee's sale on the Property during the pendency of this litigation.  Should such a sale be re-noticed, Plaintiff will seek to again amend to name any trustee who notices such sale if that trustee is not already a party.

14.     Plaintiff is currently unaware of the identity and capacity of ABC CORPORATIONS 1 through 15, XYZ LIMITED LIABILITY COMPANIES 1 through 15, 123 BANKING ASSOCIATIONS 1-15; 456 DEED OF TRUST TRUSTEES 1-15, and DOES 1 through 15, but will amend the Complaint when their identities have been ascertained.  Plaintiff alleges upon information and belief, however, that each and every presently unknown defendant is in some manner responsible for the acts or conduct of other Defendants, or were and/or are responsible for the injuries, damages, and harm incurred by Plaintiff.

///

///

# FACTS RELATED TO LOAN ORIGINATION

15.     On or about May 25, 2005, Charles Perkins entered into an Adjustable Rate Note (the "Note") and Deed of Trust (the "DOT") with Lender IndyMac Bank (collectively, the Note and DOT may be referred to as the "Loan").

16.     At the time of Loan origination, the loan broker and IndyMac Bank placed Mr. Perkins, then an 87-year-old man, into a Pay-Option-Arm for the purchase of the Property. In order to qualify this 87-year-old man for this loan, the broker Alex Halgarten with Sunset Mortgage Company in Chadds Ford, Pennsylvania, overstated Mr. Perkins' income in an alarming amount of $8,750.00 per month. This was done in spite of the fact that Plaintiff was required to provide the loan officer Mr. Perkins' proof of income, which at that time consisted of $1,800 in social security benefits, and $3,000 from a pension. Mr. Perkins also signed an authorization form for the Lender to obtain his tax returns; the tax returns were never ordered, or were never consulted to determine Mr. Perkins' actual income. Instead, the Loan originators chose to place an elderly man into a Loan he could not afford and could never repay based on the Note terms. Sunset Mortgage received a loan origination fee of $7,315 for putting Mr. Perkins into that Loan.

17.     The Note shows an initial principal balance of $532,000.00. IndyMac Bank is listed as the Lender on the Note. The Borrower is identified as Charles A. Perkins. An unauthenticated copy of the Note is attached hereto as Exhibit "1."[1]

18.   The Note states that:

(a) "Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the 'Note Holder;'"

(b) if the borrower is in default, "the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date the Note Holder

---

[1] Plaintiffs do not admit that this is a true and accurate copy of the Note. Until Plaintiff has been provided a copy of the Note with all endorsements, and given the opportunity to examine the original Note, she does not admit the debt or the validity of same.

5

may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me....”

(c) “[i]f the Note Holder has required me to pay immediately in full ... the Note Holder will have the right to be paid back by me....”

(d) “[i]n addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the ‘Security Instrument’) ... protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.”  *See* Note, Exhibit 1.

19.     The Note IndyMac Bank presented to Mr. Perkins to sign, is of the “pick your payment” type, which allows the borrower to pay less than the monthly interest accrual, which unpaid interest is then transformed into principal, which then accrues interest.  The Note allows for continuous negative amortization; the principal balance grows every month, and continues to grow until it hits the limit of 110% of the amount originally borrowed.  When that limit is hit, the payments are recalculated at the then-existing interest rate, escalating to a monthly amount sufficient to repay the unpaid principal in full on the maturity date in the Note.  This would cause, and did cause, a drastic increase in monthly payment beyond the borrower’s means.

20.     Plaintiff was present with Mr. Perkins when the loan documents were signed.  To the best of her knowledge and belief, and as the daughter of Mr. Perkins, the initials placed on pages 1 through 3 of the Note, are forgeries.  The interest rate shown on the Note is only 1%.  However, the interest could be adjusted on July 1, 2005, the date the *very first payment* was due under the Note, and every single month thereafter, for the life of the Loan.

21.     The DOT also identifies IndyMac Bank as the Lender, and Charles A. Perkins as the Borrower and Trustor.  MERS “acting solely as a nominee for Lender” is named as the beneficiary on the DOT.  The DOT is dated May 25, 2005, and was recorded

in the Maricopa County Recorder's Office at Document No. 2005-0708046 on May 26, 2005, allegedly securing the original principal amount of $532,000.00.

22. IndyMac's handling of the DOT confirms that IndyMac's only goal was to originate the Loan on whatever terms expedient, as its plan was to immediately sell the loan and generate a quick profit. An unauthenticated copy of the DOT is attached hereto as Exhibit 2; stamped, even at the time of initial recording, **RESALE**.

23. The DOT, a "Fannie Mae/Freddie Mac UNIFORM INSTRUMENT":

(a) requires the Lender to give the Trustor (i.e., the Plaintiff) 30 days' notice of default before accelerating the Note balance;

(b) requires that the Lender give the Trustee written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, before the Trustee may initiate a sale;

(c) imposes a duty on the Lender to release the DOT "[u]pon payment of all sums secured by this Security Instrument....";

(d) secures to Lender (*not the beneficiary*) (i) the repayment of the Loan, and (ii) the performance of borrowers' covenants and agreements under the DOT and Note; and

(e) states that if applicable law is silent on whether the parties may agree to something by contract, "such silence shall not be construed as a prohibition against agreement by contract."

*See* DOT, Exhibit 2, at p. 3; 9 ¶ 16; 11 ¶¶ 22, 23 (with quoted provisions highlighted).

24. MERS is listed as beneficiary under the DOT solely for the purpose of avoiding recording an assignment of the DOT each time the Loan was purportedly sold/assigned/transferred. The DOT was given MERS MIN No. 100055401212933230.

25. MERS does not take possession of notes and did not take possession of Plaintiff's Note. The Note does not list MERS as a nominee, beneficiary, Lender, or Note Holder. The Note was never endorsed to MERS, nor endorsed in blank and held by MERS. MERS

never had any financial interest in the Loan; MERS does not originate loans or lend money.

26.   The deed of trust statutes define "beneficiary" as "the person named or otherwise designated in a trust deed as the person for whose benefit a trust deed is given, or the person's successor in interest." A.R.S. § 33-801(1).   The person for whose benefit a trust deed is given, is the Lender/Note Holder.   *See* Exhibit 2 at 3 ("This Security Instrument secures to Lender: (i) the repayment of the Loan….").

27.   MERS was never the true beneficiary under the DOT.

28.   MERS requires those which use MERS' database to be members of MERS. Only those taking specialized training, who are officers of member companies, are authorized to be certifying officers of MERS.   Only certifying officers of MERS may sign documents on behalf of MERS.

29.   On January 11, 2011, the MERS ServicerID stated that "Deutsche Bank National Trust company as Trustee" is the "Investor" on the loan related to the Property, and the servicer was OneWest Bank FSB in Pasadena, California.   A copy of this MERS ServicerID is attached hereto as Exhibit 3.

30.   As of February 9, 2014, the MERS ServicerID system shows the servicer of this Loan is OneWest Bank, National Association in Austin, Texas, and that the Loan is "inactive" on the MERS system.   When Plaintiff attempted to access the page providing "investor" information, www.mers-servicerid.org would not provide access.   A copy of the MERS ServicerID system page with the alleged servicer information on this Loan is attached hereto as Exhibit 4.   This information is false; Ocwen Loan Servicing, LLC is now the servicer of the Loan.

31.   At an unspecified time, the Note was allegedly endorsed, in blank, and without recourse, from IndyMac Bank, F.S.B., by Vincent Dombrowski, Vice President. *See* Exhibit "1," p. 3.

8

32.     On December 20, 2007, Charles Perkins passed away.  At the time of his death, just over two years after loan initiation, Mr. Perkins had dementia.  The Plaintiff is executor of his estate, and inherited the Property.

### THE INDYMAC INDX MORTGAGE LOAN TRUST 2005-AR14

33.     The Defendants revealed, for the first time, in an Assignment of Deed of Trust (the "Second Assignment") signed on May 25, 2010 and recorded on June 2, 2010, that the Loan was purportedly sold into the IndyMac INDX Mortgage Loan Trust 2005-AR14 (the "Trust"), which is governed by a Pooling and Servicing Agreement (the "PSA") dated June 1, 2005.  A copy of this Second Assignment is attached hereto as Exhibit 16.

34.     The PSA was entered into by IndyMac MBS, Inc. (the "Depositor"), IndyMac Bank, FSB (the "Seller" and "Master Servicer"), and Deutsche Bank National Trust Company (the "Trustee").  The PSA was filed with the Securities and Exchange Commission on January 24, 2006, with an 8-K.[2]

35.     The PSA states that the Seller transfers to the Depositor, without recourse, all the interest of Seller in each Mortgage Loan, and that Seller shall deliver by the Closing Date of June 29, 2005, the Mortgage File for each Mortgage Loan, to the Depositor or Trustee.  *See* PSA, an excerpt of which is attached hereto as Exhibit 5, § 2.01(a) and definition of "Closing Date" at 15.

36.     The Depositor also transferred to the Trustee, "for the benefit of the Certificateholders, without recourse, all the interest of the Depositor in the Trust Fund...."  Depositor was also required to deliver, in connection with the transfer of each Mortgage Loan, "for the benefit of the Certificateholders," the original Mortgage Note, endorsed in blank without recourse, and the original Mortgage along with an executed assignment of the Mortgage together with any interim recorded assignments.  Exhibit 5, § 2.01(b), (c)(i)-(iii).

---

[2] The entire document is over 170 pages long, and can be found at https://www.sec.gov/Archives/edgar/data/1331814/000090514806000665/0000905148-06-000665-index.htm

37.     The Seller was required to have the MERS System changed to show that the Mortgage Loans had been assigned by Seller to the Trustee for the benefit of the Certificateholders by including an identification of the series of the Certificates issued in connection with such Mortgage Loans.   Exhibit 5 § 2.01 at 44-45.

38.     The Trustee was required, within 30 days of the transfer of the Mortgage Loans to it, to "affix the Trustee's name to each assignment of Mortgage as its assignee," and deliver the assignment for recording at the appropriate public office for real property records.   Exhibit 5 § 2.01 at 45.

39.     The transfer of the Mortgage Loans was to occur on or before the Closing Date of June 29, 2005.

40.     The Trustee acknowledges receipt of the documents and declares that it holds such documents constituting the Mortgage Files for the Mortgage Loans and the assets in the Trust Fund, "in trust for the exclusive use and benefit of all present and future Certificateholders."   Exhibit 5 § 2.02.

41.     "Certificateholder or Holder" is defined in the PSA as the person in whose name a Certificate is registered in the Certificate Register.   Exhibit 5 at 13.

42.     The Certificateholders of the Trust are therefore the Note Holder/Lender under the Note and DOT.   OneWest Bank admits this, in a response to a Request for Admission: "OWB admits only that persons and/or entities which hold interests in IndyMac INDX Mortgage Loan Trust 2005-AR14 (the holder of the promissory note attached as Exhibit "A" to the First Amended Complaint in this matter) have rights and obligations as set forth in that trust's documents...."

43.     "Mortgage Loan" is defined in the PSA the mortgage loans transferred and assigned to the Trustee pursuant to the PSA, as from time to time are held as a part of the Trust Fund.   Exhibit 5 at 23.

44.     "Mortgage File" is defined in the PSA as the mortgage documents listed in Section 2.01 (including the original Note, original Mortgage, and assignments).  Exhibit 5 at 23.

45.     "Trustee" is defined as Deutsche Bank National Trust Company.  Exhibit 5 at 40.

46.     The PSA is governed by and construed in accordance with the laws of the state of New York.  Exhibit 5 § 10.03.

47. Under New York law, every sale, conveyance or other act of the Trustee in contravention of the Trust, is void.  EPTL § 7-2.4.

48. The MERS ServicerID which claims that "Deutsche Bank National Trust Company as Trustee" is the "Investor" on the Loan, is false.  Exhibit 3.  As is fully alleged above and acknowledged by Deutsche Bank, Deutsche Bank as Trustee does not own the Loan, and Deutsche Bank as Trustee is not the Lender/Note Holder on the Loan.

49.     On September 4, 2009, attorneys for DBNTC filed a Petition in Orange County Superior Court in California, case No. 30-2009-00300317-PR-TR-LJC.  In that Petition, DBNTC confesses that "[w]ith few exceptions, the Trustee does not know the names and addresses of the beneficial owners of the Securities [backed by pools of residential mortgage loans], who can trade or otherwise transfer their ownership interests at any time without affecting the registered ownership of the Securities."  The beneficial owners of the Securities, according to the DBNTC, are mutual funds, insurance companies, state and local governments, federal government-sponsored entities, "and other investors residing throughout the United States and throughout the world."  A copy of the Petition of Deutsche Bank National Trust Company is attached hereto as Exhibit 6.  *See* Petition ¶¶ 3, 4.

///

///

11

50.     The DBNTC Petition lists the Trust at issue here, as one of the Trusts at issue in the Petition.  Accordingly, even the Trustee of the Trust, DBNTC, has no idea who the investors are, who are potential Note Holders with the right to enforce the Note.  *See* Petition Exhibit 1.

## LOAN MODIFICATION ATTEMPTS

51.     On July 1, 2008, the payments due under the Note adjusted and went from $2,385.30 to $4,268.18.  That same day, Plaintiff contacted IndyMac for assistance due to the near doubling of the payment.  Plaintiff was told she had to be in default to obtain assistance.

52.     This statement was in fact false; programs were available through IndyMac Bank for borrowers in danger of default, who were not in default.

53.     On July 11, 2008, IndyMac Bank ceased to exist.  It was taken over by the FDIC, and its assets were placed into the newly created entity, IndyMac Federal.

54.     On November 2, 2008, Plaintiff spoke with Sabrina at IndyMac Federal, who told Plaintiff that IndyMac Federal was the loan originator and would make decisions on a loan modification.  Sabrina promised to send the necessary paperwork to start the loan modification process.

55.     In December of 2008, Plaintiff engaged the services of Power of Freedom to assist her with the modification process.  Plaintiff completed all paperwork requested from IndyMac Federal.   Plaintiff received a letter from IndyMac Federal about Project Lifeline/HOPE.  On December 22, 2008, Plaintiff spoke with Tabatha at IndyMac Federal about her modification possibilities.

56.     Plaintiff was lead to believe, by IndyMac Federal and later IndyMac Mortgage employees, that she would be given a loan modification.

57.     Nevertheless and in spite of having a loan modification application in process, Defendants initiated foreclosure in February of 2009.

58.     On March 25, 2009, IndyMac Mortgage claimed that it had sent Plaintiff documents regarding a new principal and interest payment.  Plaintiff never received these documents.

59.     In June and July of 2009, Plaintiff had extensive contact and conversations with Sam Countess of IndyMac Mortgage regarding her application for a loan modification.  Plaintiff had been steered to apply, through IndyMac Mortgage, for a HAMP loan modification.  Mr. Countess assured Plaintiff that even if she did not qualify at a 31% loan to income ratio, that she could reapply for a 37% ratio.

60.     On July 29, 2009, Plaintiff called again for Mr. Countess, and was told he had been relocated.  Laurie Rios told Plaintiff that in spite of the fact that IndyMac Mortgage had encouraged her to apply for a HAMP modification, the investor on the loan had not even agreed to participate in HAMP.  Ms. Rios told Plaintiff that the investor would soon sign on with HAMP, and in the meantime IndyMac Mortgage would put Plaintiff on a forbearance plan by the end of which, the investor would be signed up for HAMP. Ms. Rios lead Plaintiff to believe she would receive a HAMP modification.

61.     The forbearance payment amount was $2,131.59, and payments were to be made by the 7th of the month, for August through December of 2009, with January 7, 2010, being the last month of the forbearance agreement.  The forbearance was later extended to include February and March of 2010.

62.     On November 7, 2009, Plaintiff contacted IndyMac Mortgage, to be proactive, and get the paperwork necessary to reapply for a HAMP loan modification. Beede told Plaintiff that the loan was now HAMP eligible, and 60-90 days would be needed for the analysis.  Plaintiff submitted the documents to IndyMac Mortgage in a timely fashion.

63.     On January 7, 2010, Laurie Rios extended the Forbearance Plan for two additional months, and said the investor was now participating in the HAMP program.

1 | Ms. Rios told Plaintiff what else was needed for the application.   Plaintiff faxed all
2 | necessary documents the same day.

3 |      64.     On January 10, 2010, Ms. Rios had an extended conversation with Plaintiff,
4 | explaining that she needed to demonstrate another $1,000 per month in income to qualify
5 | for the loan modification.  Plaintiff took in a renter to achieve that income goal.

6 |      65.     On January 11, 2010, Plaintiff spoke with Erin who said all paperwork was
7 | complete, and no foreclosure sale was scheduled.  Erin said Plaintiff would receive her
8 | packet in two weeks, but to make the same payment again on February 1 if it was not
9 | received in time.  In fact, a sale date of January 21 was scheduled; Erin did not tell Plaintiff
10 | of the pending sale.

11 |      66.     On January 21, Plaintiff happened to call to check the status.  She spoke with
12 | Ms. Rios who said some documents were missing, even though Erin had said 10 days
13 | earlier that all had been received.  Ms. Rios also told Plaintiff that a sale was set for that
14 | day, but it had been based on an erroneous entry that Plaintiff had missed a payment.
15 | Plaintiff faxed all requested documents, again, the following day.

16 |      67.     On January 28, Plaintiff spoke with Raul at IndyMac Mortgage.  He was
17 | combative and rude.  Raul told Plaintiff that she "failed the PV" but refused to tell Plaintiff
18 | what that meant.  Plaintiff tried to explain that Ms. Rios was handling the matter, but Raul
19 | simply responded that it was "over" for Plaintiff and she should "just deal with it."

20 |      68.     Plaintiff spoke with Ms. Rios later on January 28, and reaffirmed the two
21 | month extension on the Forbearance Plan while the paperwork was being completed.

22 |      69.     Unnerved and upset by the negligent acts and/or intentional bad faith on the
23 | part of IndyMac Mortgage, Plaintiff retained the services of Dynamic Mortgage Solutions
24 | to assist her.

25 |      70.     Dynamic Mortgage Solutions submitted a complete modification package on
26 | behalf of Katrina Perkins Steinberger, on February 17, 2010.   Additional requested
27 | information was provided on February 24, 2010.

28 |

14

71.     On March 12, 2010, Plaintiff received a letter approving a trial period plan under HAMP.  The trial plan was for three months with a payment of $1,906.00, due on the first of the months of April, May and June.  In spite of the fact that IndyMac Mortgage had been working with Plaintiff for over two years, knowing that Charles Perkins was deceased and approved the trial period plan based on Ms. Steinberger's financial information, IndyMac Mortgage sent the paperwork for Mr. Perkin's signature, and the letter was addressed to him.  When Plaintiff pointed this out to IndyMac Mortgage, she was told to just sign his name to the document, so she did.  Ms. Steinberger has a General and Durable Power of Attorney from her father.  Plaintiff also provided all documents requested along with the signed Trial Period Plan, to IndyMac Mortgage, in a timely manner.  A copy of the March 12, 2010 Trial Period Plan is attached hereto as Exhibit 7.

72.     On March 28, 2010, Plaintiff called IndyMac Mortgage to make the first payment due under the Trial Period Plan.  IndyMac Mortgage refused to accept the payment, claiming they did not receive the documents requested in the March 12, 2010, letter, which were not even due until the next day.

73.     On March 29, 2010, Plaintiff called again and was told the same thing, by 7 different people at IndyMac Mortgage, including Kimberly, Constance, Leslie and Jose. Even though Plaintiff proved that IndyMac Mortgage received the documents on March 23, 2010 by UPS and provided the tracking number, IndyMac Mortgage still refused to accept her payment because IndyMac Mortgage had not yet entered the documents in their system.  Ms. Steinberger finally got a supervisor named Christine to agree to note the system that Ms. Steinberger had a 7-day grace period to make the payment due April 1, 2010, because IndyMac Mortgage was refusing to offer the payment being tendered.

74.     On March 30, 2010, Lori from IndyMac Mortgage told Dynamic Mortgage Solutions that Plaintiff was on a Trial Period Plan and the foreclosure was on hold.

75.     It was not until April 4, 2010, that Plaintiff was able to get information on how to send her payment so that it would be accepted.  She wired the payment on April 5.

76.     On April 6, 2010, Ms. Steinberger through Dynamic Mortgage Solutions, submitted the death certificate for Charles Perkins, to IndyMac Mortgage.

77.     On May 18, 2010, Heather from IndyMac Mortgage requested updated financial information, tax returns, and the death certificate, again.  All documents were faxed to IndyMac Mortgage.

78.     Plaintiff sent her payment for May, on April 30, by MoneyGram.  On May 4, the payment was returned with an explanation that it was only partial funds.

79.     On May 11, 2010, IndyMac told Plaintiff her modification was denied, but refused to give a reason.  On May 18, Plaintiff received a letter claiming the need for documents which had already been provided.

80.     On June 1, 2010, Plaintiff sent the June modification payment by MoneyGram.  On June 3, IndyMac Mortgage sent a letter returning the payment claiming it was only partial funds.

81.     On June 10, 2010, IndyMac Mortgage again sent a letter claiming it did not receive certain documents, which had already been sent.  The same letter was again sent on June 15.

82.     On July 1, 2010, Plaintiff sent a payment via MoneyGram.  That same day, Andrea at IndyMac Mortgage told Dynamic Mortgage Solutions that the HAMP trial period plan was never valid because they never received the package of documents in April.

83.     On August 2, 2010, Mary from IndyMac Mortgage told Dynamic Mortgage Solutions that the trial period plan had been broken because the payments had not been made on time.

84.     Plaintiff tendered all payments due under the Trial Period Plan in a timely manner and for the correct amount.  Any payment made after the due date was caused solely by the negligent and/or intentionally wrongful conduct of IndyMac Mortgage/OneWest Bank, in refusing to accept the timely offered payments.

16

85.     In spite of full and complete performance of the Trial Period Plan on the part of Ms. Steinberger, IndyMac Mortgage/OneWest Bank failed and refused to give Ms. Steinberger the permanent modification she was promised.  That permanent modification should have been granted in July of 2010, at 2% interest: "[o]nce we confirm you are eligible for a home affordable Modification and you make all of your trial perod paments on time, *we will send you a modification agreement* detailing the terms of the modified loan."  *See* Exhibit 7 at 3 (emphasis supplied).

86.     For the remainder of August and through September 27, 2010, Plaintiff and Dynamic Mortgage Solutions provided an entire new loan modification package and updated documents and responded to multiple requests for multiple copies of documents which had already been provided, to IndyMac Mortgage.  On September 17, and again on September 27, IndyMac Mortgage stated that all documents had been received, the file had been escalated, and a decision was forthcoming.

87.     A trustee's sale date of November 9, 2010, had meanwhile been set.

88.     On September 8, 2010, IndyMac Mortgage refused to consider modifying the Loan, claiming it did not have time before the trustee's sale, then set 30 days away, to review the documents.

89.     Then, on October 13, 2010, IndyMac Mortgage sent a letter stating that Plaintiff's loan modification request had been entered into the system, that no additional information was needed, and a determination would be made within 30 days.

90.     Plaintiff never received the permanent modification to which she was entitled, from IndyMac Mortgage, on her 2010 HAMP application and after successful completion of the Trial Period Plan.  She also never got a response to the package she resubmitted at IndyMac Mortgage's request in August of 2010.  In desperation, and in order to protect her rights in her home, Plaintiff was forced to file this lawsuit on November 3, 2010.

17

91.     During this litigation, at Defendants' suggestion, Plaintiff again applied for a HAMP loan modification, in February of 2011, with the assistance of her counsel.  In spite of providing all documents requested, Plaintiff *again* never received a response to her application.

92.     Defendants *again*, in August, 2011, encouraged Plaintiff to apply for a HAMP loan modification.  Plaintiff and her counsel *again* submitted all documents requested.  Defendants never granted or declined her application.

## LOAN DOCUMENTATION CHANGES AND FORECLOSURE ACTIVITY

93.     At an unspecified time, the Note was endorsed, in blank, and without recourse, from IndyMac Bank, F.S.B., by Vincent Dombrowski, Vice President.  *See* Exhibit "1," p. 3.

94.     On February 13, 2009 at 10:02 a.m., Roger Stotts, a Chief Administrative Officer and Vice President of IndyMac Federal, signed an Assignment of Deed of Trust as a Vice President of MERS, "as nominee for IndyMac Bank, F.S.B." (the "First Assignment").  This document purported to assign the DOT and the Note from MERS to IndyMac Federal Bank, FSB.  Mr. Stotts is not an employee of MERS, nor is he an authorized Certifying Officer on behalf of MERS.

95.     MERS was only a nominee; not the true beneficiary under the DOT and not the Note Holder/Lender.   Only the true Lender/Note Holder can assign the DOT; MERS was not the agent for the Lender, nor was QLS.  MERS never possessed the Note and never had an interest in the Note; any attempt by MERS to transfer the Note or assign the DOT as a true beneficiary, is as a matter of fact, impossible and invalid.

96.     MERS did not have the Note to sell or transfer, therefore the First Assignment is invalid.  A transfer of a deed of trust, without the note, is a nullity.

97.     The First Assignment was not notarized until March 23, 2009, *five weeks later*, by Mai Thao, who by the act of notarization, claims that Roger Stotts "personally

18

1  appeared" before Mai Thao and acknowledged his signature.  The notary did not witness
2  Mr. Stotts' signature, nor did Mr. Stotts appear before Mai Thao and acknowledge his
3  signature.  The notary is located in Williamson County, Texas, while Mr. Stotts was
4  located in Austin, Texas, in Travis County.  The First Assignment is void.

5      98.     By the time Mai Thao notarized Mr. Stotts' signature on the First
6  Assignment, IndyMac Federal had ceased to exist, and on March 19, 2009, its assets had
7  been sold to OneWest Bank FSB.  This defective and void First Assignment was recorded
8  on March 31, 2009, nevertheless.  The First Assignment is invalid.  A copy of the First
9  Assignment is attached hereto as Exhibit 8.

10     99.     As sophisticated financial service providers, all Defendants knew the terms
11  of the Note and DOT and the law; that MERS could not legally be the true beneficiary and
12  never possessed the Note, and that therefore the representations in the First Assignment
13  regarding MERS' transferring the Note and DOT were knowingly false.  The First
14  Assignment is void as a matter of fact.

15     100.    On February 17, 2009, Jim Montes of Quality Loan Service Corporation
16  ("QLS") signed a Substitution of Trustee, substituting his employer QLS as Trustee under
17  the DOT in place of Chicago Title Ins. Co. (the "First Substitution").  Mr. Montes claims
18  to be an Assistant Vice President of IndyMac Federal; in fact he is simply a New Orders
19  Clerk for QLS; he is not even an officer of QLS.

20     101.    QLS had no authority to sign the First Substitution.  The DOT requires that
21  the trustee receive, in writing, the Lender's declaration of default and election to foreclose
22  before initiating foreclosure.  QLS never received such a writing.  QLS only received an
23  electronic transmission from FIS Foreclosure Solutions in Mendota Heights, MN, using
24  lpsdesktop.com, telling QLS to foreclose.  FIS Foreclosure Solutions improperly identified
25  the "Investor" as "Deutsche Bank" and "Deutsche Bank Trust," and incorrectly stated,
26  "mortgage currently held by and foreclosure should be in the name of: IndyMac Federal
27  Bank FSB."

28

102.    DBNTC admits that it did not send QLS written notification of a default under the Loan.  DBNTC further admits that it "defers to and relies upon the servicer of the Loan for loan-level decision-making, including the initiation of foreclosure proceedings."

103.    QLS was not, therefore, the agent of the Lender.  QLS sought no other confirmation and began the process to take Plaintiff's home.  A copy of the Foreclosure Transmittal Package from FIS Foreclosure Solutions is attached hereto as Exhibit 9.

104.    In the First Substitution, Mr. Montes claims that QLS is "authorized agent" for IndyMac Federal.  This representation is false; QLS had only a September 11, 2007 letter from IndyMac Bank authorizing it to "execute substitutions of trustee in the state of Arizona" under A.R.S. § 33-804(D).  QLS was never authorized by the Note Holder, Lender to take any action.  A copy of the letter from IndyMac Bank is attached hereto as Exhibit 10.

105.    The First Substitution is also void, because it depends, for its legality, on the validity of the First Assignment, which is void.

106.    The First Substitution claimed that IndyMac Federal was the present beneficiary under the Deed of Trust.  This assertion was in fact false; the true beneficiary in 2009 was all the Certificateholders of the Trust; even the public record showed that at best IndyMac Bank and/or MERS was the beneficiary, because the First Assignment is invalid.

107.    Under A.R.S. § 33-804(D), the Substitution must be signed by "all beneficiaries under the trust deed or their agents as authorized in writing…."  IndyMac Federal was not the true beneficiary under the DOT, because the Loan had been sold into the Trust back in 2005.  QLS did not have the authority from the true beneficiary or beneficiaries, to sign the First Substitution.  The recorded First Substitution is therefore void, as a matter of fact.

108.    The void and defective First Substitution was recorded on February 17, 2009, at Doc. No. 20090131953, and is attached hereto as Exhibit 11.

109.    As sophisticated financial service providers, all Defendants knew the terms of the Note and DOT and the law; that the Loan was sold into the Trust, and that QLS could not legally substitute itself as trustee under the DOT for the reasons alleged above, and that therefore the representations in the First Substitution were knowingly false.

110.    On February 17, 2009, Jim Montes of QLS also signed the Notice of Trustee's Sale (the "NTS"), setting a sale date on the Property for May 19, 2009. This time, Mr. Montes claims to be signing as Assistant Vice President of QLS, even though he is simply a New Orders Clerk. The NTS was recorded on February 17, 2009, at Doc. No. 20090131954. A copy of the NTS is attached hereto as Exhibit 12.

111.    The DOT and the Note require that Plaintiff be given 30 days' notice of default and an opportunity to reinstate before foreclosure is initiated, from the Note Holder/Lender. Plaintiff did not receive this writing from the Note Holder/Lender.

112.    Under A.R.S. § 33-808(C)(5), the NTS must contain the name and address of the beneficiary. The NTS prepared and recorded by QLS, and pursuant to which Defendants then sought to foreclose on Plaintiff's home, claimed that "IndyMac Federal c/o IndyMac Bank" was the beneficiary. The Defendants knew that "IndyMac Federal c/o IndyMac Bank" could not be the true beneficiary as the First Assignment was invalid and void, and the Loan had been sold into the Trust, making the Certificateholders of the Trust, the only true beneficiary and Note Holder/Lender. To be a true beneficiary, that entity must also be the Note Holder and Lender; only that entity can be secured by the DOT.

113.    All Defendants, as sophisticated financial service providers, of the conflicting information as to the true beneficiary; the representation that "IndyMac Federal c/o IndyMac Bank" was the beneficiary, placed in the recorded NTS, was knowingly false.

114.    The Lender never notified QLS in writing of an alleged default and of the Lender's election to foreclose on the Property, which is required under the DOT. QLS was not properly appointed Trustee under the DOT, and had not received any written instruction from the Lender to regarding default or election to foreclose. QLS was therefore not the agent of the Lender. The First NTS is void.

21

115.     Because the First Assignment is invalid, the First Substitution which depends on the validity of the First Assignment is invalid as a matter of fact, and the First NTS, which depends on the validity of the First Assignment and the First Substitution, is also invalid.

116.     Further, failure of QLS to confirm a default through the only entity which can declare a default, the Note Holder/Lender, and the failure to provide the identity of the true beneficiary and the beneficiary's address, violates Arizona statutes. *See, e.g.*, A.R.S. § 33-807(A); 33-808(C)(5).

117.     The NTS is void because: (1) QLS never received a writing from the Lender declaring a default and electing to foreclose, a condition precedent to initiating foreclosure; (2) the NTS is not signed by an individual with legal authority to set a Trustee's Sale on behalf of the Lender/Note Holder, or even on behalf of IndyMac Federal or QLS; (3) QLS was not legally appointed Trustee; (4) the First Assignment upon which the NTS depends is void and invalid; (5) the Trustor never received a writing from the Lender giving her 30 days' notice to reinstate the Loan; (6) it violated A.R.S. §§ 33-808(C)(5), 33-807(A).

118.     On February 20, 2009, QLS sent a Debt Validation Notice stating that trustee's sale documents provided with the Debt Validation Notice, which included the NTS and the First Substitution, related to a debt owed to IndyMac Bank FSB. In fact, IndyMac was a defunct entity, with no assets and to whom no debt was owed, at the time these documents were created. The Debt Validation Notice was false and invalid. A copy of the Debt Validation Notice prepared and sent by QLS is attached hereto as Exhibit 13.

119.     On February 20, 2009, QLS issued a Statement of Breach or Non-Performance, claiming default on the loan since November 1, 2008. The Statement of Breach was allegedly issued by Tere Camacho, described as "IndyMac Federal Bank FSB by Quality Loan Service Corp., as agent." Ms. Camacho was not a legally authorized "agent" of IndyMac Federal; Tere Camacho is an employee of QLS. The Statement of Breach fails to identify either the beneficiary or the creditor; it only states that the borrower should contact IndyMac Bank FSB "to arrange for payment...." At the time this

22

document was created and mailed, IndyMac Bank no longer existed, and QLS had no authority to act for IndyMac Federal. A copy of the Statement of Breach is attached hereto as Exhibit 14.

120.    Under A.R.S. § 33-809(C), the Statement of Breach or Non-Performance must be signed by the beneficiary or its agent.  The Statement of Breach or Non-Performance is signed by no one, but Tere Camacho's name is typed in for QLS "as agent" of IndyMac Federal.  QLS claimed that the beneficiary elected to foreclose, but in fact QLS never received such an election from the true beneficiary and Lender.  QLS was not even the legal agent of IndyMac Federal, in any event. *See* Exhibit 10.  QLS claims that there was a breach of the Trust Deed, consisting of a payment default in installments of principal and interest, and other amounts.  This Statement of Breach is void and invalid, because QLS was not the agent of the true beneficiary, which must also be the Note Holder/Lender, which entity never wrote to QLS and declared a default and elected to foreclose.

121.    On May 15, 2009, Plaintiff faxed a letter to IndyMac requesting the name of the "Investor or Investors who have ownership interest" on the Loan; on May 18, 2009, IndyMac Mortgage, using IndyMac Federal stationary, sent a letter stating that "the investor on our loan is Deutsche Bank."  Ms. Steinberger again received the same letter dated July 2, 2009, this time from IndyMac Mortgage on IndyMac Mortgage stationary, stating exactly the same thing.  This is false; the "Deutsche Bank" has nothing whatever to do with the Loan or even the Trust.  Even had DBNTC be identified as the "investor" that still would have been wrong, as DBNTC in only the Trustee and has no direct financial interest in the Trust.  Copies of these two letters and Ms. Steinberger's inquiry, are attached hereto as Exhibit 15.

122.    On July 22, 2009, Plaintiff learned from QLS that the trustee's sale had been reset for August 6, 2009.

123.    On May 25, 2010, IndyMac Federal, an entity with no legal existence since March 19, 2009, purportedly signed an Assignment of Deed of Trust (the "Second

Assignment"), assigning the DOT to Deutsche Bank National Trust Company, as Trustee of the IndyMac INDX Mortgage Loan Trust 2005-AR14, Mortgage Pass Through Certificates, Series 2005-AR14, under the Pooling and Servicing Agreement dated June 1, 2005. A copy of the Second Assignment is attached hereto as Exhibit 16.

124.    Such a late assignment of the DOT into the Trust is a violation of the PSA, which required that all documents pertaining to the mortgage loans that made up the Trust, be transferred into the Trust by its Closing Date of June 29, 2005. The assignment to DBNTC had to be recorded within 30 days of the transfer of the Loan to the Trust.

125.    The Second Assignment is signed by the now infamous robo-signer of IndyMac documents, Erica A. Johnson-Seck, designated as Attorney in Fact. This robosigner has testified[3] that she worked for IndyMac, then IndyMac Federal, and then OneWest. She has testified that she checks approximately 10% of the documents she signs for accuracy; the remainder of the documents she signs, which averages approximately 750 per week, she does not read at all before she signs them. Ms. Johnson-Seck testified that she spends no more than 30 seconds on each document. Ms. Johnson-Seck further testified that she never signs any of the documents in front of a notary, and her signature is never notarized the same day that she signs.

126.    This Second Assignment is defective and void because the First Assignment which purported to assign the DOT from MERS to IndyMac Federal was void, because the Second Assignment is signed by the infamous robo-signer Erica A. Johnson-Seck who admits she does not appear before a notary to acknowledge her signature, because IndyMac Federal did not exist and had no assets in May of 2010, and because under the PSA, the DOT had to be assigned to the Trust by June 29, 2005 and the assignment had to be recorded within 30 days thereafter. Further, the Note could not have been assigned

---

[3] References to her testimony here are to a deposition she gave on July 9, 2009, in a judicial foreclosure case in the Circuit Court of the Fifteenth Judicial Circuit in Palm Beach County, Florida, *IndyMac Federal Bank, FSB, v. Israel A. Machado, et al.*, Case No. 50 2008 CA037322, full deposition transcript available here: http://scr.bi/9nUtyo.

24

through this Second Assignment just as it could not have been assigned through the First Assignment. A transfer of a deed of trust, without the note, is a nullity. The Second Assignment was recorded on June 2, 2010, at Doc. No. 2010-0470443.

127.    As sophisticated financial service providers, all Defendants knew the terms of the Note and DOT and the law; that the Note could not be assigned through the First Assignment and therefore could not be assigned through the Second Assignment; that both the DOT and the Note had to have been assigned and endorsed to the Trust back in 2005 to be legally in the Trust, and therefore the representations in the Second Assignment regarding were knowingly false. The Second Assignment is void as a matter of fact.

128.    Because of the confusion with the documents recorded against the Property, Plaintiff made a Freedom of Information Act Request to the FDIC on October 20, 2010, asking for information on the identity of parties with standing to enforce the Loan.

129.    On October 27, 2010, John F. Elmore, Counsel for the FOIA/Privacy Act Group, Legal Division of the FDIC provided information that OneWest is servicing the loan; the response said nothing about ownership of, or entitlement to enforce, the Note or DOT. A copy of the e-mail response from the FDIC is attached hereto as Exhibit 17.[4]

130.    On October 28, 2011, Defendants IndyMac Mortgage/OneWest Bank, MERS and DBNTC filed a Motion to Dismiss the Complaint in this action. The Motion was granted on March 22, 2012.

131.    In April, 2012, Plaintiff filed a Special Action, No. 1-CA-SA 12-0087, appealing the dismissal of all counts of the Complaint. The Court of Appeals heard oral argument on May 9, 2012, and accepted Special Action jurisdiction. During oral argument, the 3-judge panel ordered the Defendants to take no further action toward foreclosure, and the matter was taken under advisement.

132.    In an effort to obfuscate Plaintiff's appeal and to avoid an adverse ruling by the Court of Appeals, the Defendants cancelled the trustee's sale on May 25, 2012, and

---

[4] The Servicing Agreement is not attached in Exhibit 17 as it is voluminous; it is available on the FDIC.gov website, and excerpts are attached in Exhibit 24.

1  then filed a Motion to Dismiss Appeal on June 11, 2012, claiming the Special Action was
2  moot.  The Cancellation of Trustee's Sale was recorded on May 29, 2012, at Doc. No.
3  2012-0455766.  A copy of the Cancellation is attached hereto as Exhibit 18.

4  133.      Defendants IndyMac Mortgage/OneWest Bank, DBNTC and MERS justified
5  their tactics by pointing to a minute entry Judge McVey had issued in this matter nearly a
6  year earlier, on June 13, 2011, giving the Defendants the right to cancel and re-notice the
7  trustee's sale, but keeping the injunction against conducting the sale, in place.  The
8  Defendants had chosen not to cancel the sale, but when to do so would benefit them and,
9  they believed, prevent an adverse Court of Appeals opinion (which seemed likely after oral
10  argument), they used the old ruling for an improper ulterior purpose; to thwart Plaintiff's
11  valid appeal.

12  134.      The Court of Appeals denied the Motion to Dismiss Appeal, on July 27,
13  2012, and ultimately ruled in favor of the Plaintiff and reinstated all her claims, save one,
14  for quiet title under A.R.S. § 12-1101 *et seq.*

15  135.      Undaunted, the Defendants continue clouding Plaintiff's title with
16  recordings.

17  136.      On June 27, 2012, an Assignment of Beneficial Interest in Deed of Trust was
18  signed by Jose Carlos San-Pedro, signing as "JC San Pedro," claiming to be Attorney-in-
19  Fact for the FDIC "as Receiver for IndyMac Federal Bank, FSB."  This Third Assignment
20  "grants assigns and transfers" to DBNTC as Trustee, "all of Assignor's right, title and
21  interest" in the DOT "if any," including any interest obtained through the First Assignment
22  of 2-13-09, recorded 3-3-1-09.  This Third Assignment does not refer to the Note, and is
23  notarized in Travis County, Texas.  A copy of the Third Assignment, recorded on July 30,
24  2012 at Doc. No. 2012-0669886, is attached hereto as Exhibit 19.

25  137.      The Third Assignment is void and invalid.  Mr. San Pedro is not an
26  Attorney-in-Fact for the FDIC and is not an authorized signatory outside of foreclosure.
27  Mr. San Pedro signs this Third Assignment as an individual.   Mr. San Pedro has no

28

1  authority to sign the Third Assignment.  The FDIC as receiver for IndyMac Federal, never

2  had any interest in the Note or DOT, so there was no "right, title and interest" to assign.

3  Further, under the PSA, the Assignment to DBNTC had to be prepared by the Closing

4  Date of the Trust of June 29, 2005, and recorded within 30 days thereafter.  In addition, an

5  assignment of a deed of trust without the Note, is a nullity.  By this Third Assignment,

6  Defendants admit that the Note has been split from the DOT since 2005. The Third

7  Assignment is void as a matter of fact.

8      138.      Also on June 27, 2012, an Assignment of Beneficial Interest in Deed of Trust

9  was signed by Jose Carlos San-Pedro, signing as "JC San Pedro," claiming to be Assistant

10  Secretary of MERS.  This Fourth Assignment "grants assigns and transfers" to DBNTC as

11  Trustee, "all of Assignor's right, title and interest" in the DOT.  In the Fourth Assignment

12  "Assignor intends to convey to Assignee any right, title and interest" in the DOT "that

13  Assignor may hold, and to confirm that Assignor retains no right, title or interest in and to"

14  the DOT.  This Fourth Assignment does not refer to the Note, and is notarized in Travis

15  County, Texas.  A copy of the Fourth Assignment, recorded on July 30, 2012, is attached

16  hereto as Exhibit 20.

17      139.      The Fourth Assignment is void and invalid.  Mr. San Pedro is not an

18  Assistant Secretary of MERS, nor did he complete the necessary training to become a

19  Certifying Officer for MERS.  Mr. San Pedro signed the Fourth Assignment as an

20  individual; he cannot qualify as a Certifying Officer because he is not an officer of another

21  entity, as required by MERS.  The Fourth Assignment is "to confirm" that MERS has no

22  interest in the DOT.  Because MERS is not a valid or true beneficiary under the DOT, any

23  attempt by it to assign the DOT is invalid.  Further, under the PSA, the Assignment to

24  DBNTC had to be prepared by the Closing Date of the Trust of June 29, 2005, and

25  recorded within 30 days thereafter.  In addition, an assignment of a deed of trust without

26  the Note, is a nullity.  By this Fourth Assignment, Defendants admit that the Note has been

27  split from the DOT since 2005. The Fourth Assignment is void as a matter of fact.

28

140.     In the alternative, if Mr. San Pedro is a MERS employee, then the Fourth Assignment is invalid; MERS is located in Virginia, where the Assignment was signed on June 27, 2012, and on the same day, Diana C. Miralles claimed that he personally appeared before her in Travis County, Texas.

141.     And finally, the Defendants have filed another Substitution of Trustee.  On August 14, 2012, OneWest Bank, FSB, as Attorney in Fact for DBNTC, denominated "Beneficiary," substituted Keeley Smith, then an attorney at Quarles & Brady LLP, as trustee under the DOT.  This Second Substitution was recorded on August 20, 2012 at Doc. No. 2012-0744352.  A copy of the Second Substitution is attached hereto as Exhibit 21.

142.     Under A.R.S. § 33-804(D), the Second Substitution must be signed by "all beneficiaries under the trust deed or their agents as authorized in writing...."  DBNTC is not the true beneficiary under the DOT, because DBNTC is not the Note Holder/Lender. Neither OneWest Bank nor DBNTC had the authority from the true beneficiary or beneficiaries, to sign the Second Substitution.  The recorded Second Substitution is therefore void.

143.     As sophisticated financial service providers, all Defendants knew or should have known of the conflicting information as to the true beneficiary and of the law defining the beneficiary as the one for whose benefit the trust deed is given.  The representation that DBNTC is the beneficiary, placed in the recorded Second Substitution, was knowingly false.

144.     The Second Substitution is void.  The Assignments on which it depends, are void and invalid.  OneWest Bank itself has admitted in this lawsuit that the Certificateholders are the Note Holder, and the PSA clearly states that DBNTC is simply the Trustee of the Trust, not a beneficial holder of an interest in the Trust Fund.  *See, e.g.,* PSA, Exhibit 5, §§ 2.01 (b), (c), 8.03.  "The Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future holders of the

1 | Certificates." *Id.* at § 2.06.   Therefore, DBNTC is not a true beneficiary of the DOT, and
2 | cannot substitute a trustee under the DOT.

3 |     145.      There are multiple parties expressing conflicting interests in the Note and the
4 | Property.  IndyMac Bank was the original lender but is insolvent and no longer exists; the
5 | assets were transferred to IndyMac Federal, which is also now insolvent and no longer
6 | exists; the FDIC may have an interest but claims immunity from any court action;
7 | OneWest Bank purchased the assets of IndyMac Federal, and is being made whole or at
8 | least 80% whole by FDIC payments pursuant to the Shared-Loss Agreement and/or
9 | insurance payments; DBNTC is the Trustee of a Trust into which the Note was supposedly
10 | transferred, but DBNTC has confessed to a Superior Court in California that it has no idea
11 | who the Certificateholders of the Trust are; QLS substituted itself as Trustee, without
12 | authority, on behalf of IndyMac Federal which at the time was not the beneficiary under
13 | the DOT, and issued a void Notice of Trustee's Sale based on a void Substitution; four
14 | different Assignments of Deed of Trust have been recorded, each claiming to assign the
15 | DOT and the Note to various entities, and a new trustee has been substituted on the DOT,
16 | without authority from the true beneficiary.

17 |     146.      Plaintiff alleges that the whereabouts of the Note are unknown.  The First
18 | Assignment purports to assign not only the DOT but also the Note, to IndyMac Federal,
19 | from MERS.  However, MERS was never in possession of the Note.  The Second
20 | Assignment purports to transfer the DOT, and the Note, from IndyMac Federal to DBNTC.
21 | This Second Assignment indicates that the Note was sold into a pool as a part of a
22 | mortgage-backed security, and is subject to a PSA.  The mortgage pool could contain tens,
23 | hundreds, or thousands of investors, all having the status of Certificateholder, with a claim
24 | to the Loan; DBNTC doesn't even know who these Certificateholders are.  And the PSA
25 | required that all original Notes be endorsed and turned over to the Trust back in 2005.

26 |     147.      And now, in an effort to establish their claim to enforce the Loan, the
27 | Defendants have instead further clouded the title by recording *two more assignments,*

28

1  neither of which is valid: one, from MERS (which already claims to have assigned its
2  interest away, and in any event had no legal interest to assign) claiming to assign the DOT
3  and the Note, and two, from the FDIC for IndyMac Federal to DBNTC again claiming to
4  assign the DOT and the Note.  But the FDIC, had no interest to convey since the Note was
5  sold into the Trust back in June of 2005, the FDIC sold IndyMac Federal's assets to
6  OneWest Bank in 2009, and the Loan was never properly conveyed to IndyMac Federal.

7      148.    None of the Defendants or predecessor entities are the Lender/Note Holder
8  as defined in the Note and DOT.

9      149.    If any of the Defendants are allowed to enforce the Note or DOT without
10  demonstrating status as the true Lender/Note Holder and beneficiary, and without showing
11  that particular Defendant's entitlement to payment (i.e., proof that the Note has not already
12  been paid by the FDIC, insurance coverage or otherwise), Plaintiff is in jeopardy of other
13  individuals and/or entities appearing at a later date and claiming legitimate and legal
14  entitlement to payment under the Note and to enforce the DOT.  This will result in double,
15  up to exponential, liability on the Note and risk of improper foreclosure.

16      150.    No Defendant is the Note Holder/Lender because no entity took the Note by
17  transfer and is entitled to payment, while also being the true beneficiary of the DOT.

18      151.    No Defendant can legally initiate a trustee' sale without Plaintiff's receiving
19  a writing from the Note Holder/Lender giving her 30 days to cure any alleged default, and
20  without the Lender's writing to the trustee of the DOT, declaring a default electing to
21  foreclose on the Property.  Failure to satisfy these conditions precedent will be a breach of
22  Note and DOT, and a violation of Arizona statute.  A.R.S. § 33-807(A).

23  ///
24  ///
25  ///
26  ///
27  ///
28

## THE FAILURE OF INDYMAC ENTITIES AND SALE OF ASSETS; SHARED-LOSS AGREEMENT AND ASSOCIATED CONTRACTS

152.     On July 11, 2008, IndyMac Bank ceased to exist.  It was placed into conservatorship by the FDIC, and its assets were placed into the newly created entity, IndyMac Federal, for which the FDIC also served as conservator.

153.     On March 18, 2009, the FDIC as conservator for IndyMac Federal entered into a Master Purchase Agreement with IMB HoldCo LLC ("HoldCo") and OneWest Bank Group LLC.[5]   As set forth in this Master Purchase Agreement, OneWest Bank Group LLC, a "direct wholly owned subsidiary of HoldCo," formed OneWest Bank, FSB, a "direct wholly owned subsidiary" of OneWest Bank Group.   OneWest Bank then purchased most of the assets of IndyMac Federal, on March 19, 2009, including its servicing rights and its residential mortgage loan portfolio.   An excerpt of the Master Purchase Agreement is attached hereto as Exhibit 22.

154.     The Master Purchase Agreement states that the FDIC executed a Guaranty "as an inducement to HoldCo to enter into this Agreement and incur the obligations set forth herein….." *Id.* at 2.

155.     The Master Purchase Agreement states that the FDIC will reimburse HoldCo, OneWest Bank Group, and OneWest Bank, "for Losses incurred as a result of any Third Party Claims relating to liabilities arising from assets of or the acts or omissions of [IndyMac Bank], IndyMac Federal or the FDIC prior to the Closing…." *Id.* at ¶ 17.01(a). Third Party Claims are defined as "a claim, counterclaim or demand made by any Person" against any of those 3 entities. *Id.* at 15.

156.     On March 19, 2009, the FDIC for IndyMac Federal, and OneWest Bank, entered into a Shared-Loss Agreement.  Pursuant to the Shared-Loss Agreement, OneWest

---

[5]  The entire Master Purchase Agreement can be downloaded off the FDIC.gov website, at www.fdic.gov/about/freedom/IndyMacMasterPurchaseAgrmt.pdf

bears little, if any, financial burden related to the default on the loans purchased from IndyMac Federal.  Essentially, the FDIC reimburses OneWest at 80% for any default in payments on those loans.  A copy of the Shared-Loss Agreement dated March 19, 2009, is attached hereto as Exhibit 23.

157.    The Shared-Loss Agreement, combined with insurance coverage and/or other sources of reimbursement, has on information and belief resulted in OneWest's either being paid in full for the Note, or having received at least 80% of the payments due on the Note.

158.    On March 19, 2009, the FDIC for IndyMac Federal, and OneWest Bank, entered into a Servicing Business Asset Purchase Agreement (the "Servicing Agreement"). The Servicing Agreement required the FDIC to transfer to OneWest Bank "the Servicing Rights and the Servicing Files in respect of the Mortgage Loans."  A copy of excerpts of the Servicing Agreement is attached as Exhibit 24.[6]

159.    The Servicing Agreement defines "Servicing File" as all documents in possession of the FDIC, including copies of the Mortgage File. *Id.* at 11.  "Mortgage File" is defined as, all documents that are in the possession of the FDIC "**other than the original Mortgage Note….**" *Id.* at 8 (emphasis supplied).

160.    Under the Servicing Agreement, the FDIC is to reimburse OneWest Bank for losses incurred as "as a direct result of a final, nonappealable order of a court of competent jurisdiction awarding damages in connection with a Third Party Claim asserted against [OneWest Bank]." *Id.* at § 8.03(a).  If OneWest Bank recovers insurance proceeds related to the loss, the FDIC is not liable. *Id.* at § 8.03(d).  OneWest Bank is required to pursue receipt of insurance proceeds which would reduce the FDIC's losses under the Servicing Agreement. *Id.* at § 10.04.

---

[6]  The entire Servicing Agreement can be found downloaded off the FDIC.gov website, at www.fdic.gov/bank/individual/failed/ServicingBusinessAssetPurchaseAgreement.pdf

## SERVICING TRANSFERS OF THE LOAN

161.    On April 10, 2009, Plaintiff was sent a Notice of Assignment, Sale or Transfer of Servicing Rights.  The letter stated that the servicing rights to the Loan were "assigned, sold or transferred from IndyMac Federal Bank, FSB to IndyMac Mortgage Services, a division of OneWest Bank, FSB."

162.    On November 15, 2013, Plaintiff was sent a Notice of Servicing Transfer telling her that servicing of her Loan was being transferred from IndyMac Mortgage Services, a division of OneWest Bank, FSB, to Ocwen Loan Servicing, LLC effective December 1, 2013.

163.    The identity of the true Note Holder/Lender with entitlement to enforce the Note and DOT, if any, is unknown; the Note was to have been endorsed and provided to the Trust in 2005; the DOT has never validly been assigned to the present Note Holder/Lender, if any.

164.    None of these Defendants has authority to enforce the Note; no Defendant both possesses the Note and was also **entitled to payment**, as required by the clear contractual terms of the Note.

165.    At Loan initiation, the Lender was secured by the DOT.  That security has been nullified by assigning the DOT to multiple entities not the Note Holder in violation of the PSA with the result that the Note and DOT are split.  An assignment of a deed of trust without the note, is a nullity; the DOT must be released.

166.    No Defendant is the true beneficiary and the Note Holder/Lender, therefore, no trustee's sale can be initiated.

167.    Any entity which is the transferee or holder of the Note, or the assignee of the Deed of Trust, is subject to any and all affirmative claims and/or defenses the Plaintiff could have asserted against IndyMac Bank as the originator of the loan, or any other legal entity in the true chain of title.

///

33

1

2 **COUNT ONE**

3 **DECLARATION RE CONTRACT RIGHTS OF THE PARTIES/LACK OF STANDING TO ENFORCE NOTE AND DEED OF TRUST/VOID ASSIGNMENTS**

4 **OF DEED OF TRUST, SUBSTITUTIONS OF TRUSTEE, AND NOTICE OF TRUSTEE'S SALE/ VACATE VOID DOCUMENTS**

5 **(ALL DEFENDANTS)**

6 168.    Plaintiff repeats and realleges every allegation above as if fully set forth

7 herein.

8 169.    Plaintiff seeks a declaration and order from this Court regarding the standing

9 of the Defendants and the rights of the parties with respect to the Note, Deed of Trust, and

10 the validity and enforceability of the Assignments, Substitutions, and NTS.

11 170.    The Note specifically states that in order to be the "Note Holder," one must

12 have taken the Note by transfer, **and** be entitled to payment.  Only the Note Holder/Lender

13 may demand payment, accelerate the balance under the Note, elect to foreclose, and tell

14 the borrower and trustee of the default and its election to foreclose.   Only the Note

15 Holder/Lender may enforce the rights under the Note, and *only the Note Holder* is

16 protected from losses by the Deed of Trust. *See* Exhibits 1, 2. The Note Holder/Lender is

17 the only entity which may be the beneficiary under the deed of trust statutes.

18 171.    The DOT states that if applicable law is silent on a subject, the parties may

19 agree to whatever terms they choose. *See* Exhibit 2, ¶ 16.

20 172.    The Arizona statutes governing non-judicial foreclosures do not specifically

21 require that a foreclosing entity produce the original note in order to foreclose.   The

22 statutes do not prohibit that requirement, either; the statutes are silent on the issue.

23 173.    The DOT states that only the Lender may send written notice to the trustee of

24 an event of default, and of the election to cause the property to be sold. *See* Exhibit 2, ¶

25 22.  The deed of trust statutes do not allow the trustee to initiate foreclosure without a

26 default.  A.R.S. § 33-807(A).

27 174.    The Note defines the Lender as "anyone who takes this Note by transfer and

28 who is entitled to receive payments under the Note...." Therefore, to identify the Lender,

34

that entity must demonstrate that it took the Note by transfer and that it is entitled to receive payments under the Note.

175.    As fully set forth in, without limitation, ¶¶ 94-127, 136-144 above, the document(s) prepared, signed and recorded by the Defendants, to take Plaintiff's home, and the letters addressed to Ms. Steinberger, do not comply with the terms of the Note and DOT nor with applicable statutes.   The Assignments, Substitutions and NTS contain defects which render the documents, as a matter of fact, void, invalid, and unenforceable.

176.    Under the Note and DOT and applicable law, any attempt to initiate another sale or foreclose on Plaintiff without proving status as the Note Holder/Lender and true beneficiary, and otherwise being in compliance with all contract terms, is invalid.

177.    Under applicable law, the Defendants cannot foreclose without complying with the statutory requirements to do so.

178.    If any Defendant/Defendants are found to be parties to the Note or DOT, that/those Defendant/Defendants has/have breached the contracts, and failed to follow applicable statutes and laws, as set forth above.

179.    If the Defendants are found not to be parties or agents of parties to the Note or DOT, as is alleged above, Defendants have no standing to enforce the Loan or initiate or conduct a foreclosure of the Property.

180.    Plaintiffs seek a declaration or an Order from this Court, that pursuant to the Note and Deed of Trust, only the Note Holder/Lender and true beneficiary may pursue foreclosure, and that the Defendants must therefore prove their status as Note Holder/Lender and true beneficiary, before they may be allowed to initiate or conduct a Trustee's Sale.

181.    Plaintiffs seek a declaration or an Order from this Court, that no Defendant is the Note Holder/Lender, nor has any Defendant sought foreclosure as the legal agent of the Note Holder/Lender, under written direction from the Note Holder/Lender as required by the Note and DOT.

182.    The First Assignment is invalid and void as fully set forth in, without limitation, ¶¶ 94-99 above.

183.    The PSA required that the original Note and Deed of Trust be turned over to the Trust by June 29, 2005.  The First Assignment demonstrates that MERS was in possession of the DOT, while the PSA states that the Note was in the Trust.  Therefore, by the agreement of the parties to the PSA and by agreement of the Lender and MERS as set forth in the DOT, the Note and DOT have been split since at least June 29, 2005, with the Trust possessing the Note and MERS possessing the DOT.

184.    MERS did not possess the DOT as an agent of the Lender; the PSA required that the DOT be assigned to the Trustee and that assignment be recorded, within 30 days of transferring the Note to the Trust.  This was not done.

185.    The First Substitution is void and invalid, as fully set forth in, without limitation, ¶¶ 100-109 above.

186.    The NTS is void and invalid as fully set forth in, without limitation, ¶¶ 110-117 above.

187.    The Second Assignment is void and invalid as fully set forth in, without limitation, ¶¶ 123-127 above.

188.    The Third Assignment is void and invalid as fully set forth in, without limitation, ¶¶ 136-137 above.

189.    The Fourth Assignment is void and invalid as fully set forth in, without limitation, ¶¶ 138-140 above.

190.    The Second Substitution is void and invalid, as fully set forth in, without limitation, ¶¶ 141-144 above.

191.    A note and deed of trust are inseparable.  If a note and deed of trust are separated, in that the Note Holder/Lender and the beneficiary of the deed of trust are not the same individual or entity, the note becomes unsecured, when the entities are not principal/agent.

///

36

192.    The Note and DOT have been separated since June of 2005, and the beneficiary under the DOT is not the principal or the agent of the Certificateholders of the Trust, or the Trust Fund.

193.    The assignment of a deed of trust without a legal transfer of the debt, transfers nothing.

194.    The Defendants having voluntarily separated the Note/debt from the DOT; the DOT secures nothing.

195.    Defendants seek to enforce the Note and Deed of Trust.  Because the Note has been unsecured since June of 2005, no Defendant may legally pursue foreclosure pursuant to the Deed of Trust.

196.    No Defendant has standing to pursue foreclosure, as no one Defendant is both the true beneficiary of the Deed of Trust and also the Note Holder.

197.    Further, pursuant to the terms of the Note, only the Note Holder can enforce the Note through foreclosure or otherwise.

198.    Under the Note and DOT and applicable law, any attempt to assign the beneficial interest in the DOT to another, or to enforce the DOT without simultaneously being the Note Holder/Lender, is void.

199.    At no time, has any Defendant been both the Note Holder/Lender and the true beneficiary of the DOT, simultaneously.

200.    The Statement of Breach and the Debt Validation Notice are both void and invalid as fully set forth in, without limitation, ¶¶ 118-119 above.

201.    Plaintiff seeks a declaration or Order from this Court that the First, Second, Third and Fourth Assignments, the First and Second Substitutions and the NTS are void and unenforceable, and that these recorded documents must be vacated, cancelled, nullified and rescinded and title cleared of these groundless, false, invalid documents which also contain material misrepresentations, with recordings at the Maricopa County Recorder's Office.

202.    Plaintiff further seeks a declaration or Order from this Court that no party may notice or re-notice a trustee's sale without proving status as Note Holder/Lender and true beneficiary under the Note and Deed of Trust as affirmed by the Court, and otherwise complying with the contracts, and applicable law.

203.    Plaintiff seeks a further declaration or Order from this Court that the Note and DOT require that only the Note Holder/Lender may enforce the terms of the Note and accelerate the balance, that only the Note Holder/Lender is protected by the Deed of Trust as security, and only the Note Holder/Lender may initiate foreclosure of the Deed of Trust. Any other result subjects Plaintiff to the danger of multiple liability on the Note, and an endless string of false beneficiaries initiating void and invalid trustee's sales.

204.    Plaintiff seeks a further declaration or Order that no Defendant is the Note Holder/Lender and true beneficiary, that the DOT has been rendered a nullity by separating it from the Note, and that until an entity can prove its status as Note Holder/Lender, no entity may seek to enforce the Note.

205.    Plaintiff is entitled to her attorney's fees and costs arising out of this claim, pursuant to the Note and DOT and A.R.S. § 12.341.01.

### COUNT TWO
### BREACH OF CONTRACT
### (ALL DEFENDANTS)

206.    Plaintiff repeats and realleges every allegation above as if fully set forth herein.

207.    Defendants, as an alleged beneficiary, servicer, trustee, or alleged successor or assign of a party to the Note and/or DOT, are all bound in contractual privity with Plaintiffs.

208.    In pursuing a Trustee's Sale in violation of the terms of the Note and DOT, as set forth in, among other places, ¶¶ 18, 21, 23, 25-27, 94-127, 136-151 above, the Defendants have breached the Note and DOT, as well as the statutes which are a part of every contract.

209.     In pursuing a Trustee's Sale in violation of the deed of trust statutes and law as set forth in, among other places, ¶¶ 26, 104, 107, 112, 116, 117, 120, 142, 151, 173, 236, 260, 265, which are a part of every contract, the Defendants have breached the Note and DOT.

210.     In pursuing a trustee's sale in violation of the contracts and applicable law, Defendants breached the duty of good faith and fair dealing implied in every contract.

211.     Defendants' breaches of contract caused Plaintiff damages in the form of the concrete and particularized injury of the initiation of foreclosure without performing conditions precedent to a valid sale including failing to receive a declaration of default and election to foreclose from the Lender, acceleration of the Note without authority, negative amortization on the Note, late fees, penalties, accruing interest, trustee's fees, and other fees which would not have been incurred but for the improper initiation of foreclosure, attorney's fees, the requiring of liquidation of assets to post $7,500.00 in bond funds for an illegal trustee's sale, retention of loan modification companies, failed HAMP application attempts, and other damage.

212.     IndyMac Mortgage/OneWest Bank also breached the March 12, 2010, Trial Period Plan with Plaintiff when it failed to offer Ms. Steinberger a permanent modification after she fully complied with the terms of the Trial Period Plan, as set forth above.

213.     As this matter arises out of contract, Plaintiff is entitled to her attorney's fees and costs incurred, pursuant to the contracts and pursuant to A.R.S. § 12-341.01.

## COUNT THREE
### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### (ALL DEFENDANTS)

214.     Plaintiff repeats and realleges every allegation above as if fully set forth herein.

215.     Defendants are obligated under the Note and DOT, the First and Second Substitutions, the First, Second, Third and Fourth Assignments, the NTS, and the common law, to act in good faith and to deal fairly with Plaintiff.

216.    The purpose of this covenant is to guarantee that the parties remain faithful to the intended and agreed-upon expectations of the parties in their performance.

217.    The duty of good faith extends beyond the written words of the contracts.

218.    When a party or parties to a contract manipulate bargaining power to its/their own advantage, injuring the other party, the party/parties with bargaining power breach its/their duty of good faith.

219.    Plaintiff reasonably expected that the entities which would seek to enforce the Loan would be those legally entitled to do so.

220.    Plaintiff reasonably expected that the entities with standing to enforce the Loan or those who appeared and claimed that entitlement, would use good faith and deal fairly in initiating and proceeding with foreclosure.

221.    Defendants and/or their agents breached their duty of good faith and fair dealing by, without limitation:

a)    hiding from Plaintiff the identity of the true beneficiary by affirmatively misrepresenting to Plaintiff that the true beneficiary was IndyMac Federal and DBNTC, through letters and the recording of false documents, and initiating or allowing the initiation of foreclosure without having a writing from the Lender declaring a default and electing to foreclose and without confirming that the Lender had sent Plaintiff the required 30-day notice of default; by allowing parties not the Lender, to masquerade as the party entitled to declare default, accelerate the balance, and instruct QLS to foreclose;

b)    hiding the identity of the true Note Holder/Lender by affirmatively misrepresenting the "investor" of the Loan as "Deutsche Bank" or "Deutsche Bank Trust" or "Deutsche Bank as Trustee" through correspondence to Plaintiff, false recordings, and false designations on the MERS ServicerID;

c)    failing to comply with contractual obligations, including without limitation allowing an entity, not the Note Holder and Lender, to declare a default, to accelerate the debt, and to initiate a foreclosure;

40

d)      initiating foreclosure without requiring that the Lender notify the Deed of Trust trustee, in writing, that the loan was in default, and of an election to foreclose;

e)      seeking to proceed to Trustee's Sale on clearly invalid documents, i.e., the First and Second Assignments, the First Substitution, the NTS, the Statement of Breach and Debt Validation Notice, as fully set forth in detail above;

f)      vacating the trustee's sale to abrogate Plaintiff's appeal rights in an attempt to obfuscate legal proceedings in an effort to wipe away the illegal documents and what at that time was 1.5 years of litigation;

g)      knowingly and purposely separating the Note from the DOT thereby rendering the Note unsecured, but attempting to foreclose on the Property or otherwise enforce the DOT nevertheless;

h)      falsely listing the servicer of the Loan as OneWest Bank, National Association, on the MERS database;

i)      recording groundless, false, and otherwise invalid documents, including the First, Second, Third and Fourth Assignments, the First and Second Substitutions, and the NTS, which also contain material misrepresentations, clouding title to the Property; and

j)      requesting Plaintiff to fill out no less than 4 separate complete HAMP loan modification applications, and in spite of Plaintiff's fully performing on the Trial Period Plan, and providing all documents requested by IndyMac Mortgage/OneWest Bank, these Defendants failed and refused to offer Plaintiff a permanent modification, and further failed and refused to timely (or at all) process the three other applications and provide a timely acceptance or declination of the applications.

222.     As a result of Defendants' failure to act in good faith and with fair dealing, Defendants have caused Plaintiff concrete and particularized injury, in the form of a default claimed by the Defendants but not asserted by the Note Holder/Lender, acceleration of the Note, attorneys' fees and costs paid to stop an invalid trustee's sale sought by entities with no standing to do so and without the Defendants' having performed conditions precedent to a valid sale and to pursue an appeal, losses sustained in having to

41

1  liquidate assets to post a $7,500.00 bond, accrual of default penalties and interest, and

2  other damages, as fully alleged above.

3      223.    As this claim arises out of the contracts between the parties, Plaintiff is

4  entitled to her attorney's fees and costs incurred in having to bring this claim, pursuant to

5  the terms of the contracts as well as A.R.S. § 12-341.01.

6

7  **COUNT FOUR**

   **VIOLATION OF A.R.S. § 33-420**

8  **(ALL DEFENDANTS EXCEPT OCWEN)**

9      224.    Plaintiff repeats and realleges every allegation above as if fully set forth

10  herein.

11      225.    At the time the loan closed on May 25, 2005, the Note gave IndyMac Bank,

12  then the Lender and originator, the right to payments.

13      226.    The Note makes it clear that only one who takes the Note by transfer, **and**

14  who is entitled to receive payments, is the Note Holder.

15      227.    Numerous parties have come forward, attempting to demonstrate an

16  entitlement to the Property or entitlement to foreclose, through a claimed interest as

17  nominee on the Deed of Trust, as a beneficiary under the Deed of Trust, as a purported

18  Note Holder, "owner" of the Note, creditor, agent of a servicer or beneficiary, a substituted

19  trustee, or other undeclared, unspecified interests.

20      228.    As fully detailed above, those parties claiming interests were/are MERS,

21  IndyMac Bank, IndyMac Federal, DBNTC as Trustee, OneWest Bank, QLS, and Keeley

22  Smith.  The defective and void nature of each person/entity's claim to the Property is set

23  forth in detail above.  Each Defendant and individual or entity has actual knowledge of the

24  defects in the recorded chain of title.  Each Defendant has contributed to the cloud

25  currently existing on the title to the Property, represented by the false, groundless and

26  fraudulent documents recorded against the Property, which also contain material

27  misrepresentations.

28  ///

42

229.     As is fully set forth in allegations above, no Defendant is the true beneficiary under the DOT, as no Defendant is the Note Holder/Lender.

230.     Plaintiff is in jeopardy of multiple liabilities under the Note, because the true Note Holder is unknown.   That entity, as well as third parties, could come forward claiming an unsatisfied interest in the Note, and may or may not be subject to Plaintiff's various affirmative defenses and counterclaims.   Under the Uniform Commercial Code, if Ms. Steinberger pays the wrong entity, the debt is *not* discharged.  Given the cloud on title and the uncertainty surrounding the Note, Plaintiff is entitled to proof of the true Note Holder/Lender, and the true beneficiary if any, to avoid this imminent danger.

231.     The First and Second Assignments which purport to assign the DOT and the Note are void, as fully set forth in allegations above.

232.     The Third and Fourth Assignments which purport to assign the DOT only are void, as fully set forth in allegations above.

233.     The First and Second Substitutions are void, as fully set forth in allegations above.

234.     The NTS is void, as fully set forth in allegations above.

235.     Various Defendants have recorded these void and invalid documents against the Property, without the legal authority to do so.  Plaintiff is unable to determine which of the Defendants recorded the documents, but all Defendants recorded or caused these documents to be recorded.  These documents include, but are not limited to, the four Assignments, the two Substitutions, and the NTS.

236.     Plaintiff has suffered a distinct and palpable injury from the recorded documents all of which are groundless, contain false claims and/or material misstatements against her Property, in violation of A.R.S. § 33-420.   The recorded documents have clouded her title which has directly affected her ability to possess, use and sell the Property, as is her right.

237.     Plaintiff is entitled to an order from this Court against the Defendants, that the Plaintiff's title be quieted as against these void and invalid recorded documents, and

that the groundless and false recorded documents be declared null and void with filings at the Maricopa County Recorder's Office to that effect, and that all Defendants be ordered to prove their status as Note Holder/Lender secured by a valid DOT, before any of them may record any other documents against title.

238.     Plaintiff also seeks $1,000, or treble actual damages, and attorney's fees and against MERS and Keeley Smith, for refusing to release the First Assignment and Fourth Assignment (as to MERS) and the Second Substitution (as to Ms. Smith), within 20 days of demand to do so, which demand shall be sent on February 10, 2015.

239.     Plaintiff further seeks the statutory sum of no less than $5,000, or treble her actual damages caused by the recordings, whichever is greater, plus an award of her attorneys' fees and costs, pursuant to A.R.S. § 33-420(A).

## COUNT FIVE

### NEGLIGENT PERFORMANCE OF UNDERTAKING

### (GOOD SAMARITAN DOCTRINE)

### (IndyMac Mortgage/OneWest Bank, DBNTC, OCWEN)

240.     Plaintiff repeats and realleges every allegation above as if fully set forth herein.

241.     Defendants indicated multiple times that loan modification options were available to Plaintiff, and that they wanted to help Plaintiff.  Defendants encouraged Plaintiff to apply for a HAMP loan modification, on at least 4 occasions.

242.     When Plaintiff contacted IndyMac Mortgage/OneWest Bank seeking a loan modification, IndyMac Mortgage told Plaintiff she had to be in default to be considered. This statement was false.  IndyMac Mortgage/OneWest Bank lured Plaintiff into defaulting, and she did so, to be considered for a modification.

243.     Defendants established a loan modification program, but negligently administered it, as more fully set forth above.

44

244.     Defendants routinely demanded information already in its files.

245.     Defendants failed to timely upload modification documents into its system, causing Plaintiff to be deemed in default, and causing payment default, due to Defendants' refusal to accept payments pursuant to a Trial Period Plan which they had offered her.

246.     Defendants negligently failed to post payments to Plaintiff's account, nearly resulting in unwarranted and improper foreclosure.

247.     Defendants made inaccurate calculations and determinations of Plaintiff's eligibility for loan modification programs, including the HAMP program.

248.     Defendants failed to follow through on written, verbal and implied promises, including without limitation the time frame within which Plaintiff's loan modification package would be processed.

249.     Defendants refused to process Plaintiff's modification packages in a timely manner and acknowledge documents received, resulting in a declination of a loan modification, without valid cause, followed by a letter stating all documents had been received and the modification was in process.

250.     Defendants engaged in dilatory tactics, resulting in Plaintiff's delinquency being so great that she cannot reinstate her loan, and resulting in a Trustee's Sale being set on the Property, and her having to be embroiled in litigation for over 4 years, when she should have been given a permanent loan modification in July of 2010, before suit was even filed.

251.     Plaintiff relied on the Defendants to administer the loan modification program, and process her applications for a loan modification, in a timely manner and with due care.

252.     Defendants knew that their loan modification services were necessary for the protection of Plaintiff's Property.

253.     Defendants failed to exercise reasonable care in the administration of their loan modification program.

///

45

254.     Defendants' failure to exercise reasonable care increased the risk of harm to Plaintiff in the form of risk of foreclosure by luring Plaintiff into default and then failing and refusing to grant a permanent loan modification in 2010, and failing and refusing to exercise reasonable care in the processing of the multiple loan modification applications Plaintiff sent to Defendants, as well as economic harm as described below.

255.     Defendants' negligence in administering its loan modification program has resulted in economic harm to the Plaintiff in the form of late fees, principal and interest accrual, retention of loan modification companies, attorney's fees and costs, negative amortization of the Loan, the need to liquidate personal assets at a loss to post a $7,500.00 bond to stop an illegal foreclosure, a loss of the ability to pay down the principal on the Loan from July of 2010 forward when IndyMac Mortgage/OneWest Bank should have granted a permanent modification, and other harm.

256.     Plaintiff is entitled to damages and equitable relief from the Defendants as a result of their negligent administration of their loan modification program, including but not limited to, a permanent modification of the Loan.

**COUNT SIX**
**NEGLIGENCE PER SE**
**(INDYMAC MORTGAGE/ONEWEST BANK, MERS, SMITH)**

257.     Plaintiff repeats and realleges every allegation above as if fully set forth herein.

258.     IndyMac Mortgage/OneWest Bank, MERS and Smith knew that IndyMac Federal and MERS were not and could not be a true beneficiary under the DOT with legal authority to assign the DOT.

259.     Defendants knew or should have known that the Loan was purportedly placed into the Trust in 2005 before its Closing Date.

260.     In allowing, acquiescing in, or sending the First, Second, Third and Fourth Assignments, the First and Second Substitutions and the NTS to be recorded at the

46

Maricopa County Recorder, which contained unauthorized signatures and groundless and false information, these Defendants violated A.R.S. § 39-161 and A.R.S. § 33-420.

261.    QLS did not receive a writing from the Note Holder/Lender, declaring a default and electing to foreclose the DOT.

262.    QLS, MERS, and IndyMac Federal, were not and are not the agents of the Lender.

263.    IndyMac Mortgage/OneWest Bank nevertheless allowed QLS to sign the First Substitution and initiate a Trustee's Sale by recording the NTS or allowing or causing the NTS to be recorded.

264.    Certain of the documents, as described above, were not signed before a notary public, nor did the signer appear before the notary and acknowledge the signer's signature.

265.    In allowing documents to be notarized by notaries who did not witness the signatures or have the signers acknowledge their signatures before them, MERS and IndyMac Federal violated A.R.S. §§ 33-503, 41-311; 41-312 and 41-313.

266.    Each of these statutes was put into place for the specific purpose of protecting homeowners' interests in their homes, and the specific purpose of ensuring that individuals who sign important legal documents are actually authorized to do so.

267.    Plaintiffs are in the class of persons for whose protection these statutes were put into place.

268.    Acts in violation of these statutes constitute negligence per se.

269.    Violation of A.R.S. § 39-161 is a Class 6 felony.

270.    Violation of A.R.S. § 33-420 carries statutory damages of not less than $5,000 per recorded document or treble the actual damages, whichever is greater, plus attorneys' fees and costs.

271.    Plaintiffs seek an order of this Court that MERS and IndyMac Mortgage/OneWest, and Smith, prepare and record any and all documents needed to clear the cloud on Plaintiff's title related to their recorded documents.

272.   Plaintiff suffered and will suffer damages due to the negligence per se of MERS, IndyMac Mortgage/OneWest Bank and Smith, in the form of clouded title to the Property, statutory damages under A.R.S. § 33-420, acceleration of the Note, damage to credit, accrual of late charges, fees, costs, trustee's fees, attorney's fees, and other damage.

## COUNT SEVEN
## UNCONSCIONABLE CONTRACT/CONDUCT
## (INDYMAC MORTGAGE/ONEWEST, DBNTC, OCWEN)

273.   Plaintiff repeats and realleges every allegation above as if fully set forth herein.

274.   IndyMac Bank and its agents, successors and assigns, in placing 87-year-old Charles Perkins into a negative amortizing pick-your-payment Note, and without clearly explaining the effect and repercussions of the negative amortization and monthly interest adjustment, engaged in oppressive and unconscionable conduct, and placed Mr. Perkins into an unconscionable contract.

275.   IndyMac Bank and its agents, successors and assigns falsified Mr. Perkin's income in order to place him into a loan that he could not afford, not caring whether he could service the debt because IndyMac Bank intended to sell the Loan into a REMIC even before Mr. Perkins signed the contracts.

276.   IndyMac Bank and its agents, successors and assigns, forged Mr. Perkin's initials on pages of the contracts in order to push their "Resale" of the Loan through to a REMIC, rather than obtain legally executed documents.

277.   The Note contains unconscionable terms, such as a provision that payment of each monthly payment in full would result in an unpaid principal balance that grew, not diminished, because of the Note's negative amortization; and the interest rate listed on the Note was 1%, but that rate could adjust each month starting with the first monthly payment.

///

278. These unconscionable terms were not explained to Mr. Perkins or Ms. Steinberger, and caused unfair surprise. They did not understand that making the suggested payment would result in an escalation of the principal balance every month.

279. Mr. Perkins died of dementia two years later, and lacked the mental capacity to enter into the Note, or understand its convoluted and unconscionable terms.

280. IndyMac Bank and its agents, successors and assigns, engaged in, and are engaging in, bad faith and inequitable, oppressive, and unconscionable conduct in placing Mr. Perkins in this loan, and in continuing to attempt to enforce, and foreclose pursuant to, this loan.

281. IndyMac and its agents, successors and assigns, in seeking foreclosure, are subject to the principles of equity.

282. He who seeks equity must do equity.

283. Due to the unconscionable behavior of these Defendants, and the unconscionable nature of the Note, the Note is unenforceable, and void.

284. Defendants may not foreclose in seeking to enforce the Note, which is void for unconscionability.


**COUNT EIGHT**

**PAYMENT/DISCHARGE**

**(INDYMAC MORTGAGE/ONEWEST BANK/DBNTC/OCWEN)**


285. Plaintiff repeats and realleges every allegation above as if fully set forth herein.

286. Pursuant to the Shared-Loss Agreement, IndyMac Mortgage/OneWest Bank bears little, if any, financial burden related to the default on the loans and servicing rights purchased from IndyMac Federal. Essentially, the FDIC reimburses OneWest at 80% for any default in payments on those loans.

287.     The Shared-Loss Agreement has on information and belief resulted in OneWest's either being paid in full for the Note, or having received at least 80% of the payments due on the Note.

288.     In addition, the PSA, the Servicing Agreement, and the Master Purchase Agreement terms indicate that OneWest Bank had insurance which was to cover losses suffered as a result of defaults on loans and servicing rights purchased from IndyMac Federal.

289.     Accordingly, to the extent IndyMac Mortage/OneWest Bank has already been paid for any losses sustained as a result of the Loan, those recoveries must be offset on any amounts alleged to be due on the Loan.

290.     The DOT requires that "[u]pon payment of all sums secured by this Security Instrument, *Lender shall release this Security Instrument*."   *See* Exhibit 2 ¶ 23 (emphasis supplied).

291.     Through payments from Plaintiff/Borrower, PMI or other insurance coverage, the FDIC Guaranty referred to above, the Shared-Loss Agreement or other associated contracts, any party with a valid claim to payment under the Note as Note Holder, has on information and belief, already been paid.

**WHEREFORE**, Plaintiff requests the following relief:

A.     For a declaration and/or an Order that the Assignments, Substitutions and NTS, as well as the DOT which is now a nullity, are void and must be cancelled/revoked with recordings at the Maricopa County Recorder's Office;

B.     For a declaration and/or Order that no Defendant is the Note Holder/Lender and true beneficiary, that no Defendant may initiate or conduct a trustee's sale of Plaintiff's Property, and no Defendant has standing to enforce the Loan;

C.     For damages sustained by the Plaintiff as a result of the Defendants' breaches of contract, and breach of the duty of good faith and fair dealing;

D.     For damages sustained by the Plaintiff as a result of Defendants' negligence per se;

E.     For an Order that all recordings against title after the DOT itself be revoked/cancelled/rescinded under A.R.S. § 33-420, and for statutory damages of not less than $5,000 per recorded document or for treble the actual damages, whichever is greater and $1,000 or treble damages whichever is greater against the Defendants named in Count Four;

F.     For damages sustained as a result of the Defendants' Negligent Performance of an Undertaking and for the equitable relief of a permanent loan modification;

G.     For a ruling that the Note is unconscionable and thereby unenforceable and the DOT must be released;

H.     For a ruling that the Note has been paid through application of the Shared-Loss Agreement, insurance proceeds, and the like;

I.     For judgment for Plaintiff's attorney's fees and costs incurred, pursuant to A.R.S. § 12-341.01 and A.R.S. § 33-420(A);

J.     For any pre-judgment interest to which Plaintiff is entitled;

K.     For interest on the reasonable attorney's fees, court costs, and other costs of collection at the highest legal rate from the date of entry of judgment herein until paid in full; and

L.     For such other and further relief as the Court deems just and proper.


**JURY DEMAND**

Plaintiff demands a trial by jury as a matter of right.

DATED this 9th day of February, 2015.

BARBARA J. FORDE, P.C.

By:     s/ Barbara J. Forde
        Barbara J. Forde, Esq.
        20247 N. 86th Street
        Scottsdale, AZ  85255
        *Attorney for Plaintiff*

ORIGINAL e-filed this 9th day of February, 2015, with COPIES delivered through the ECF system to:

The Honorable Thomas LeClaire
Maricopa County Superior Court
Northeast Regional Center

John Maston O'Neal
Krystal M. Aspey
QUARLES & BRADY, LLP
Renaissance One
Two North Central Ave.
Phoenix, AZ  85004
*Attorneys for Defendants*
*IndyMac Mortgage/OneWest Bank,*
*DBNTC, and MERS*

s/Barbara J. Forde

Section 8.02    Conditions Precedent to Remedy.  The obligation of the Seller to provide a Remedy for any Defective Asset is contingent upon the satisfaction (as determined by the Seller in its sole discretion) or waiver (which may be granted by the Seller in its sole discretion) of each of the following conditions:

(a)    the Purchaser has delivered the Defect Notice and any supporting evidence required by Section 8.05 to the Seller on or prior to the Claims Termination Date, and has provided the Seller with all additional supporting evidence requested by the Seller pursuant to, and within the timeframe set forth in, Section 8.05;

(b)    the Purchaser has delivered the notice required by Section 8.04(a) to the Seller, if applicable;

(c)    neither the Purchaser nor the Purchaser's servicer has caused or materially exacerbated the Defect or increased any resulting Loss;

(d)    neither the Purchaser nor the Purchaser's servicer has taken any action or omitted to take any action (other than as required by Section 8.02(e)) that (x) materially and adversely affects the Seller's ability to process the request for, or provide, a Remedy, or (y) materially and adversely affects the ability or increases the cost to cure the Defect, or the Seller's ability to mitigate Losses, or otherwise results in a Loss (including any Excluded Loss) to the Seller;

(e)    in connection with the Defective Asset, the Purchaser or the Purchaser's servicer has complied in all material respects with the Guidelines, if applicable; and

(f)    the Purchaser has taken such additional actions that the Seller may have reasonably requested in order to mitigate Losses.

Section 8.03    Excluded Losses.  Losses that are reimbursable by the Seller hereunder shall not include any of the following:

(a)    Excluded Losses, unless such Losses are incurred by a Reimbursed Party as a direct result of a final, nonappealable order of a court of competent jurisdiction awarding damages in connection with a Third Party Claim asserted against such Reimbursed Party that would otherwise constitute Excluded Losses;

(b)    Losses arising from or in connection with claims asserted against the Purchaser by any of its Affiliates or any of its or their respective officers, directors, partners, employees, agents, creditors or stockholders (beneficial or of record);

(c)    Losses attributable to or arising from overhead allocations or general internal and administrative costs or the costs of administering or complying with the pre-approval, submission or reporting requirements imposed by or under this Agreement (such as but not limited to in-house counsel costs);

(d)    Losses reimbursable or payable by any Person (other than the Seller), including but not limited to recovery in the form of insurance proceeds; provided, however, that nothing contained herein shall require the Purchaser to pursue potential claims against prior servicers or

originators even if the successful pursuit of such claims could reduce the Seller's reimbursement obligation hereunder; or

(e)     litigation costs (including attorneys' fees and expenses) arising from or with respect to any bankruptcy action or foreclosure with respect to any Mortgage Loan.

Section 8.04    Third Party Claims.

(a)     In connection with any Third Party Claim for which any Reimbursed Party may seek reimbursement of Losses, the Purchaser shall deliver notice thereof to the Seller promptly after receipt by the Reimbursed Party of written notice of the Third Party Claim (but in any event no later than ten (10) Business Days after receipt of such written notice), describing in reasonable detail the facts giving rise to any claim for reimbursement hereunder, the amount of such claim (if known) and such other information with respect thereto as is available to the Reimbursed Party and as the Seller may reasonably request.  The notice required by this Section 8.04 shall be in addition to the notice required by Section 8.05 with respect to a Defect.

(b)     If the Seller confirms in writing to the Reimbursed Party within fifteen (15) days after receipt of a Third Party Claim that the Seller will reimburse the Reimbursed Party therefor, the Seller may elect to assume control over the compromise or defense of such Third Party Claim at the Seller's own expense and by the Seller's own counsel, which counsel must be reasonably satisfactory to the Reimbursed Party, provided that (x) the Reimbursed Party may, at its option and its own expense, employ counsel to assist in the handling (but not control the defense) of any Third Party Claim; (y) the Seller shall keep the Reimbursed Party advised of all material events with respect to any Third Party Claim; and (z) the Seller shall obtain the prior written approval of the Reimbursed Party before ceasing to defend against any Third Party Claim or entering into any settlement, adjustment or compromise of such Third Party Claim involving injunctive or similar equitable relief being imposed upon the Reimbursed Party or any of its Affiliates.

(c)     If the Seller elects not to assume control over the compromise or defense of such Third Party Claim, the Reimbursed Party, upon providing prior written notice to the Seller, may pay, compromise or defend against such asserted Third Party Claim (but the Seller shall nevertheless be required to pay all Losses incurred by the Reimbursed Party in connection with such defense, settlement or compromise).

(d)     In connection with any defense of a Third Party Claim (whether by the Seller or any Reimbursed Party), all of the parties hereto shall, and shall cause their respective Affiliates to, cooperate in the defense or prosecution thereof and to in good faith retain and furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested by a party hereto in connection therewith.

Section 8.05    Notice and Evidence of Defect.  The Purchaser shall notify the Seller of each Defective Asset with respect to which the Purchaser seeks a Remedy under Section 8.01 promptly upon discovery of the Defect, but in any event no later than ten (10) Business Days after the last day of the month in which such discovery occurs; provided, however, that if a Reimbursed Party receives written notice of a Third Party Claim, the Purchaser shall notify the

Payments as required by the Security Parties, the Servicing Agreements and Mortgage Loan Documents, all in accordance with the standard of care set forth in <u>Section 10.03</u>. Notwithstanding anything to the contrary herein, unless prohibited by Law or by contract, in the event a Defect is discovered with respect to any Servicing Right, the Purchaser shall continue to service such Mortgage Loan in accordance with this <u>Section 10.02</u>. The Purchaser agrees that it will service the Mortgage Loans in accordance with the Guidelines, as applicable. The Purchaser shall obtain and maintain all licenses necessary to perform all of its obligations hereunder with respect to the Assets and the Assumed Liabilities and shall comply with all state laws requiring licensing to the extent necessary to permit the servicing of the Mortgage Loans in accordance with the terms of this Agreement and the Servicing Agreements. In addition, the Purchaser shall take any and all actions as may be necessary or appropriate to remain a qualified servicer under each Servicing Agreement.

Section 10.03   <u>Standard of Care</u>.  With respect to the servicing of the Mortgage Loans (including the conduct of foreclosures and the management of the Mortgaged Property) and the collection of advances, the Purchaser shall (i) exercise the degree of care which is standard in the industry with respect to the servicing of similar loans (including the conduct of foreclosures and the management of property) and the collection of similar advances and claims and (ii) service such Mortgage Loans in strict accordance with applicable Law and regulations and in accordance with applicable Investor and Insurer requirements governing servicers and the provisions of the applicable Servicing Agreements. In the event there is a conflict between any provision of this Agreement on the one hand, and any applicable Servicing Agreement and/or any Investor or Insurer requirements on the other hand, the latter shall govern the Purchaser's conduct.

Section 10.04   <u>Mitigation of Losses</u>.  Subject to the provisions of the remainder of this <u>Section 10.04</u>, the Purchaser shall use its reasonable best efforts at all times to minimize the Losses for which the Seller may be liable under this Agreement. Without limiting the foregoing, in carrying out its duty to mitigate Losses for which the Seller may be liable, subject to the provisions of the remainder of this <u>Section 10.04</u>, the Purchaser shall, as applicable, pursue any counterclaim, offset, insurance settlement or other claim which would be reasonably likely to result in a recovery that would reduce the Seller's liability under this Agreement, including making prompt and proper application for and diligently pursuing receipt of insurance proceeds. If, in the Purchaser's reasonable judgment, litigation would be reasonably likely to result in a recovery that would reduce the Seller's liability under this Agreement, the Purchaser shall give the Seller written notice at least twenty (20) calendar days prior to instituting any such litigation. If the Seller agrees that such litigation should be pursued, the Purchaser shall institute litigation with respect to such potentially receivable claims.  If the Seller does not consent to such litigation within such twenty (20) day period, no failure of the Purchaser to institute such litigation shall constitute a breach by the Purchaser of its duty to mitigate losses under this <u>Section 10.04</u>. The Purchaser shall institute litigation with respect to, or assign to the Seller, any such claim if it is requested to do so by the Seller. For the avoidance of doubt, costs incurred in connection with the foregoing efforts to minimize Losses shall constitute Losses for purposes of this Agreement.

Section 10.05   <u>Reimbursement of Recoveries</u>.  Within fifteen (15) Business Days after receipt, the Purchaser shall refund to the Seller the amounts of all recoveries received by the

**IN WITNESS WHEREOF**, the parties hereto have caused this Servicing Business Asset Purchase Agreement to be executed as of the day and year first above written.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By: _George C. Alyal_____

Name: George C. Alexander
Title: Manager, Structured Transactions

ONEWEST BANK, FSB

By: _____

Name: Joshua P. Eaton
Title: Authorized Signatory

Servicing Rights Asset Purchase Agreement

**IN WITNESS WHEREOF**, the parties hereto have caused this Servicing Business Asset Purchase Agreement to be executed as of the day and year first above written.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By: _____
    Name:
    Title:

ONEWEST BANK, FSB

By: _____
    Name: Joshua P. Eaton
    Title: Authorized Signatory