IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Katrina Perkins Steinberger,

        Plaintiff,

v.

IndyMac Mortgage Services, et al.,

        Defendants.

No. CV-15-00450-PHX-ROS

**ORDER**

In 2005, Katrina Steinberger's father, Charles Perkins, borrowed $532,000 to purchase a house and associated property. Steinberger's father made monthly payments on the borrowed funds until his death in 2007. After his death, Steinberger began making monthly payments but stopped after a few months. Steinberger sought a loan modification but, after she was unable to obtain a modification, began looking for ways to remain in possession of the property despite not making monthly payments. Eventually, a trustee's sale was scheduled but, the day before that sale was set to occur, Steinberger misrepresented to the bankruptcy court that she was her deceased father and filed for bankruptcy on his behalf. The bankruptcy filing prevented the trustee's sale from occurring. A short while later, Steinberger filed this lawsuit in state court and obtained a temporary restraining order precluding any trustee sale. Some form of restraining order remained in place for years.

In 2015, Steinberger added new parties as defendants and the case was removed to federal court. Once in federal court the parties proceeded with contentious discovery

which often necessitated the Court intercede.  At the close of discovery, the parties filed cross-motions for summary judgment.  The motions establish all of Steinberger's claims fail based on a lack of evidence, lack of a coherent legal theory, or both.  As explained below, Deutsche Bank as Trustee is entitled to foreclose on the property.

## BACKGROUND

The parties have submitted very lengthy statements of fact in support of their cross-motions for summary judgment.  When there are cross-motions for summary judgment, the Court must consider each motion on its own merits, construing the evidence in the light most favorable to the non-moving party.  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  This presents a challenge here because the parties disagree on the majority of facts offered by the opposing side.  Those disagreements, however, often involve matters that have little relevance to the pending cross-motions.  Therefore, the following version of events ignores the immaterial factual disputes and focuses on the undisputed essential facts necessary for resolving the parties' claims.

In the spring of 2005, Charles Perkins and his daughter, Katrina Steinberger, began planning to purchase a house and associated property in Phoenix.  (Doc. 181-1 at 2).  The property would be purchased solely by Perkins but he planned to live there with Steinberger.  Perkins and Steinberger found property they wished to purchase, valued at approximately $692,000.  Perkins sought financing for the purchase and on April 12, 2005, received a Truth-in-Lending Disclosure Statement from Sunset Mortgage Company.  Anticipating Perkins would make a substantial down payment, that statement outlined a thirty-year loan in the amount of $532,000 with a fixed annual percentage rate of 1%.  (Doc. 183-2 at 37).  Perkins moved forward with the purchase and Sunset Mortgage completed a formal loan application on Perkins' behalf.  The closing was set for May 25, 2005.

On May 25, Perkins was presented with the final version of his loan application.  That application listed Perkins' occupation as "Retired/Investor."  (Doc. 175-6 at 2).  It

also stated Perkins had $435,740 in liquid assets, $985,000 in other assets, and liabilities of $356,137.  (Doc. 175-6 at 3).  Thus, Perkins was listed as having a net worth of $1,124,603.  The application also listed Perkins' monthly income as $10,335 and stated he owned four other properties, some of which generated rental income.  (Doc. 175-6 at 3, 4, 6).  Perkins signed the loan application, affirming the financial information was "true and correct" and that any "intentional or negligent misrepresentation" of the information could "result in civil liability."  (Doc. 175-6 at 4).

In addition to the loan application, Perkins was presented with a new loan disclosure statement.  The new statement was for a loan substantially different from the loan outlined in the previous disclosure statement.  It provided for an adjustable rate mortgage with a starting rate of 1%.  That interest rate would only last one month and could change on a monthly basis based on changes to the average twelve-month yields of United States Securities.  (Doc. 175-8; 175-3 at 2).  The new disclosure statement made clear "[t]he interest rate and payment of this loan may each change during the term of this loan."  And the new disclosure statement included a sentence, in all capitals, that "THIS LOAN ALLOWS FOR NEGATIVE AMORTIZATION."  (Doc. 175-8 at 2).  Perkins signed the new disclosure statement, acknowledging he had received and read it.  (Doc. 175-8 at 4).

The loan terms were set out in more detail in the "Adjustable Rate Note" signed by Perkins the same date.  The note specified Perkins was borrowing $532,000 from the "Lender" identified as IndyMac Bank, F.S.B.  (Doc. 175-3 at 2).  Of special importance to the issues in the present case, the note stated "The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the 'Note Holder.'"  (Doc. 175-3 at 2).  The note required Perkins make payments to the Note Holder or "at a different place if required by the Note Holder."  (Doc. 175-3 at 3).  The note informed Perkins that if he did not "pay the full amount of each monthly payment on the date it [was] due, [he] would be in default."  (Doc. 175-3 at 4).  And if Perkins were in default, the Note Holder was entitled to send "written notice telling [him]

that if [he did] not pay the overdue amount by a certain date," the entire outstanding balance might become due immediately.  (Doc. 175-3 at 4).

As referenced in the note, Perkins contemporaneously signed a Deed of Trust. There is nothing in the evidence to indicate this note was different than all standard notes used by the financial institution.  The Deed of Trust was meant to "protect[] the Note Holder from possible losses that might result" if Perkins did not make timely payments on the note.  (Doc. 175-3 at 4).  The Deed of Trust identified IndyMac Bank, F.S.B., as the "Lender," Chicago Title Insurance Company as the "Trustee," and Mortgage Electronic Registration Systems, Inc. ("MERS"), as the "beneficiary" as the "nominee for [IndyMac Bank, F.S.B.]."  (Doc. 175-4 at 2).  The Deed of Trust stated "[Perkins] irrevocably grants and conveys to Trustee, in trust, with power of sale," the property Perkins was purchasing.  (Doc. 175-4 at 4).  In the event Perkins defaulted on the note, the Deed of Trust gave IndyMac Bank, F.S.B., the authority to accelerate all sums due under the note and "invoke the power of sale."  (Doc. 175-4 at 12).  Once IndyMac Bank, F.S.B., invoked the power of sale, it had the power to instruct the Trustee to record a notice of sale and sell the property to the highest bidder.  (Doc. 175-4 at 12).

The Deed of Trust contemplated the "Note or a partial interest in the Note (together with [the Deed of Trust]) can be sold one or more times without prior notice to [Perkins]."  (Doc. 175-4 at 11).  Such a sale might change "the entity (known as the 'Loan Servicer') that collects Periodic Payments due under the Note."  (Doc. 175-4 at 11).  A sale was not required for there to be a change in the Loan Servicer.  (Doc. 175-4 at 11).  Any change in the Loan Servicer would result in Perkins receiving "written notice of the change."  (Doc. 175-4 at 11).

After signing all of these documents, Perkins took possession of the property and he and Steinberger moved in.  A few weeks after the closing, "[t]he Loan was securitized and transferred to Deutsche Bank as Trustee for the benefit of the Certificateholders of the IndyMac INDX Mortgage Loan Trust 2005-AR14, Mortgage Pass-Through Certificates, Series 2005-AR14."  (Doc. 175 at 8; Doc. 181-1 at 6).  This process

involved Deutsche Bank National Trust Company, as Trustee and Custodian of the Trust, receiving the original note on June 2, 2005.  (Doc. 175 at 8).  And Deutsche Bank National Trust Company, as Trustee and Custodian of the Trust, receiving the original Deed of Trust on June 6, 2005.  IndyMac Bank, F.S.B., through its mortgage servicing division, IndyMac Bank Home Loan Servicing, was responsible for servicing the loan and the first payment from Perkins was processed in July 2005.

On August 26, 2005, Perkins conveyed the property to "Saguaro Desert Trust." (Doc. 175-1 at 3).  There is no clear explanation of the nature of Saguaro Desert Trust, but it appears to have been an estate planning device for Perkins.  There is also no evidence Perkins informed any of the entities connected to the note and deed of trust that he had conveyed the property to a trust.  After the transfer to the trust, Perkins continued to make payments to IndyMac Bank Home Loan Servicing until his death on December 20, 2007.  Given the nature of the note, those monthly payments were not keeping up with the accruing interest.  That is, the outstanding balance was increasing each month. (Doc. 181-1 at 7).  After Perkins' death, Steinberger continued to make monthly payments.  The admissible evidence appears undisputed that Steinberger did not inform the entities involved with the note and deed of trust of Perkins' death and they continued to believe it was Perkins making the payments.  In July 2008, the loan's outstanding balance became so large that the monthly payment had to be adjusted.  The monthly payment increased from $1,977.40 to $4,263.18.  (Doc. 181-1 at 7).   In advance of this increase, Steinberger received multiple letters clearly advising her of the increase but, according to her summary judgment declaration, she "did not understand the import or effect of the letters."  (Doc. 181-2 at 4).

On July 11, 2008, IndyMac Bank, F.S.B., failed and was closed by the Office of Thrift Supervision.  (Doc. 175 at 10).  That same date IndyMac Federal Bank ("IndyMac Federal") was chartered and, on July 14, 2008, IndyMac Federal began servicing the loan.  (Doc. 175 at 10).  Steinberger made the increased payments in July, August, September, and October of 2008.  Steinberger then contacted IndyMac Federal to see if

she could obtain a modification. She was told her modification "application would not be considered unless [she] was in default under the Loan." (Doc. 181-2 at 4). Hoping to obtain a modification, Steinberger did not make another payment after October 2008.

The record does not explain why, but Steinberger was unable to obtain a modification. On January 5, 2009, IndyMac Federal sent a letter, addressed to Perkins, stating the note was in "serious default." (Doc. 183-4 at 4). The letter further stated if Perkins did not cure the default, IndyMac Federal would "accelerate [the] mortgage . . . and foreclosure proceedings [would] be initiated." (Doc. 183-4 at 4). Steinberger did not cure the default and IndyMac Federal referred the loan for foreclosure proceedings.

At that time, IndyMac Federal was acting as the servicer of the loan on behalf of Deutsche Bank as Trustee which had received the note and deed of trust a few weeks after they were executed. In performing its servicing obligations, IndyMac Federal's practice was to hire third-parties known as "foreclosure referral firms" to conduct trustee sales. (Doc. 181-4 at 26). IndyMac Federal hired Quality Loan Service Corporation ("QLS") to conduct a trustee's sale of the property. (Doc. 181-1 at 8). On February 13, 2009, an Assignment of Deed of Trust was signed by a nominee for IndyMac Bank, F.S.B. (Doc. 181-1 at 8). That document purported to assign the beneficial interest in the Deed of Trust from IndyMac Bank, F.S.B., to IndyMac Federal. On February 17, 2009, an authorized agent of IndyMac Federal signed a Substitution of Trustee, appointing QLS as the trustee under the Deed of Trust. (Doc. 181-1 at 9). Also on February 17, 2009, a QLS employee signed a Notice of Trustee's Sale. (Doc. 175-22 at 2). The trustee's sale was set for May 19, 2009. The Notice of Trustee's Sale was properly recorded the same day it was signed. (Doc. 175-22 at 2). On March 19, 2009, IndyMac Federal entered into an agreement with OneWest Bank, F.S.B., whereby OneWest Bank became the servicer of Perkins' loan. (Doc. 175 at 10). This transaction did not impact the previously noticed events and the trustee's sale was still set to proceed.

On May 18—the day before the trustee's sale—Steinberger filed a voluntary bankruptcy petition. Because the note remained in Perkins' name, Steinberger

improperly signed Perkins' name on the bankruptcy petition. Steinberger has never offered a reasonable explanation for impersonating her father in that filing. Perkins had been deceased for close to eighteen months and there were no indications his estate was in need of bankruptcy relief. Moreover, even assuming Steinberger was attempting to seek bankruptcy relief on behalf of her father's estate, it is well-established that estates cannot seek bankruptcy relief. *See, e.g.*, *In re Walters*, 113 B.R. 602, 604 (Bankr. D.S.D. 1990) ("Courts have uniformly supported the contention that the Bankruptcy Code's definitions of 'person' and 'debtor' exclude insolvent decedents' estates."). Thus, there appears to have been no legal or factual basis for the bankruptcy petition. At oral argument, Plaintiff's counsel stated Steinberger had been instructed by an attorney to file the bankruptcy petition. But given that bankruptcy relief is not available to estates, and it is obviously improper to impersonate another when filing for bankruptcy, the explanation that an attorney recommended this course of action is dubious. Steinberger has not offered the opinion from the attorney who allegedly gave this advice nor has she even identified the attorney. In short, there is no dispute the bankruptcy petition was improper. Steinberger made no effort to pursue bankruptcy relief and the petition was dismissed a few weeks later after Steinberger failed to file the required supporting documentation.

After the May 19 trustee's sale was blocked by the bankruptcy petition, another trustee's sale was not immediately scheduled. Instead, Steinberger—again alleging she was Perkins—entered into a "Forbearance Plan" with another entity identified as "IndyMac Mortgage Services." (Doc. 175-17 at 3). That plan required monthly payments of $2,131.59 for a period of six months from August 2009 through January 2010. If those six payments were made, IndyMac Mortgage Services agreed to review Perkins' "financial situation for possible loan modification." (Doc. 175-17 at 3). Steinberger made the six payments. (Doc. 181-1 at 10; Doc. 191 at 12). The parties agree the Forbearance Plan was extended for "several months" and Steinberger continued to make payments. (Doc. 181-1 at 10; Doc. 191 at 12). During this time, Steinberger sought a permanent modification but was unable to obtain one.

On July 5, 2010, Steinberger, this time using her name of Perkins, transferred the property out of the trust. According to the documents in the record, Katrina A. Perkins, Executive Trustee of Saguaro Desert Trust, conveyed the property to "Katrina A. Perkins, an unmarried woman." (Doc. 175-1 at 4). Despite taking possession in her individual capacity, Steinberger apparently was not making monthly payments and another trustee's sale was scheduled for September 8, 2010. (Doc. 175 at 13). The sale was postponed for unknown reasons and, on November 3, 2010, Steinberger, appearing pro se, filed the present suit in state court. (Doc. 12-1 at 4).

Steinberger filed her original complaint solely as "Executor of the Estate of Charles A. Perkins." (Doc. 12-1 at 4). Thus, Perkins' estate was the sole plaintiff despite Steinberger having transferred the property to herself a few months earlier. The original complaint named five defendants: IndyMac Bank, F.S.B.; OneWest Bank, F.S.B.; Deutsche Bank National Trust Co.; MERS; and QLS. The complaint alleged none of these entities were entitled to conduct a trustee's sale. Steinberger obtained a temporary restraining order on November 8, 2010. (Doc. 12-1 at 76). That order prohibited "Quality Loan Service Corporation, IndyMac Bank, and/or Deutsche Bank National Trust Company from conducting a trustee's sale." (Doc. 12-1 at 76). The restraining order expired and the state court declined to enter a preliminary injunction. (Doc. 12-1 at 80).

Shortly after the denial of the preliminary injunction, Steinberger filed an amended complaint. That amended complaint was filed by counsel and named as plaintiffs Steinberger as the Executor of Perkins' estate as well as Steinberger individually. (Doc. 12-1 at 84). The amended complaint included the following eleven claims:

1. Vacate the notice of trustee's sale
2. Temporary restraining order; preliminary injunction; permanent injunction;
3. Quiet title;
4. Breach of contract;
5. Negligent performance of undertaking;
6. Fraudulent concealment;
7. Fraud;
8. Consumer fraud;
9. Negligence per se;

10. Unconscionable contract/conduct;

11. Discharge/payment of debt.

Those claims were brought against "IndyMac Mortgage Services, a division of OneWest Bank, F.S.B."; Deutsche Bank National Trust Company as Trustee; MERS; and QLS. (Doc. 12-1 at 84).   On January 6, 2010, the state court granted another temporary restraining order preventing a trustee's sale.  (Doc. 12-1 at 237).  That restraining order was to remain in place pending a preliminary injunction hearing.  Before the preliminary injunction hearing could occur, OneWest Bank, Deutsche Bank as Trustee, and MERS filed a motion seeking to "cancel and re-notice" the trustee's sale.  (Doc. 12-1 at 265). The state court granted that motion but also ruled "no Trustee's sale shall actually occur" until the temporary restraining order was "dissolved or otherwise modified."  (Doc. 12-1 at 286).  After lengthy motion practice, on March 22, 2012, most of the claims in the amended complaint were dismissed.  That dismissal meant a trustee's sale could occur. Steinberger sought special action review of the dismissal order.[1]  (Doc. 12-2 at 167, 12-2 at 221).

The Arizona Court of Appeals accepted jurisdiction and entered a restraining order prohibiting a trustee's sale during the pendency of proceedings in the court of appeals. On January 30, 2014, the Court of Appeals issued a decision finding the trial court had erred in dismissing some of Steinberger's claims.   The Court of Appeals held the following stated claims for relief:

- "Counts One and Two: Vacate/Void Notice of Trustee's Sale";
- "Count Four: Breach of Contract";
- "Count Five: Negligent Performance of an Undertaking";
- "Count Nine: Negligence Per Se";
- "Count Ten: Unconscionability"; and
- "Count Eleven: Payment/Discharge of Debt."

But the court of appeals concluded the trial court had correctly dismissed the following claims:

---

[1] Special action review was the only appellate mechanism available because the superior court had not yet entered a final judgment.

- "Count Three: Quiet Title"; and
- "Counts Six, Seven and Eight: Fraudulent Concealment, Common Law Fraud, Consumer Fraud."

*Steinberger v. McVey ex rel. Cty. of Maricopa*, 318 P.3d 419 (Ariz. Ct. App. 2014).  The case was remanded for further proceedings on the seven claims.

After remand, Steinberger filed her second amended complaint.  (Doc. 1-2 at 2).  The amended complaint was brought by Steinberger as "Executor of the Estate of Charles A. Perkins" as well as Steinberger "individually."  The complaint asserted claims against five defendants: "IndyMac Mortgage Services, a division of OneWest Bank, F.S.B.";  "Deutsche Bank National Trust Company as Trustee of the INDYMAC INDX Mortgage Loan Trust" ("Deutsche Bank as Trustee"); MERS; Ocwen Loan Servicing, LLC ("Ocwen"); and Keeley Kristine Smith, a citizen of Arizona who had been involved in the attempted trustee sales.  The following eight claims were asserted:

1. Declaration re Contract Rights;
2. Breach of contract;
3. Breach of the Duty of Good Faith and Fair Dealing;
4. Violation of A.R.S. § 33-420 (involving errors in recorded documents);
5. Negligent Performance of Undertaking;
6. Negligence Per Se;
7. Unconscionable Contract/Conduct;
8. Payment/Discharge.

(Doc. 1-2 at 2).  The amended complaint was the first time Ocwen had been named as a party, apparently based on Ocwen's involvement with the attempted trustee sales.  Believing diversity jurisdiction existed, Ocwen removed the case to federal court on March 11, 2015.   There was some initial disagreement whether the parties were completely diverse but Plaintiff eventually agreed they were because the non-diverse party—Keeley Kristine Smith—was dismissed following defendants' claim that she had been fraudulently joined.  (Doc. 45).

On March 23, 2015, Deutsche Bank as Trustee filed a counterclaim against Steinberger as the Executor of Perkins' estate and Steinberger individually.  (Doc. 14 at 2).  Deutsche Bank as Trustee also filed a third-party complaint against Saguaro Desert

Trust, Steinberger as Trustee, M&I Marshall & Illsley Bank, QLS, and Rancho Alta Vida Homeowners' Association.  The counterclaim and third-party complaint sought judicial foreclosure.  QLS was dismissed a short time later.  (Doc. 22).  Steinberger as Executor and Steinberger individually answered the counterclaim.  (Doc. 53).  Without explanation in the record, none of the third-party defendants responded to the third-party complaint. The parties proceeded with discovery.[2]

During discovery, the parties submitted a stipulation addressing certain aspects of this case.[3]  Pursuant to that stipulation, the parties agreed to the dismissal Steinberger's count five titled "Negligent Performance of an Undertaking."  (Doc. 136 at 2).  The stipulation also reflected Steinberger as Executor and Steinberger individually were withdrawing "any part of any remaining Count that would be related to Plaintiffs' financial information."  (Doc. 136 at 2).  Finally and significantly, the stipulation provided Steinberger as Executor and Steinberger individually agreed Deutsche Bank as Trustee was "in possession of the loan documents . . . including the original Adjustable

---

[2] On October 7, 2015, Deutsche Bank as Trustee and third-party defendant Rancho Alta Vida Homeowners Association stipulated to a final judgment regarding the third-party claim.  That final judgment would reflect Deutsche Bank as Trustee's lien was "superior to all claims, interests or liens of [Rancho Alta Vida]."  (Doc. 76 at 3).  This stipulation prompted the Court to issue an order calling for briefing on the status of the third-party defendants.  (Doc. 78).  Deutsche Bank as Trustee immediately applied for entry of default regarding the third-party defendants that had not answered.  (Doc. 79-81). The Clerk entered the defaults.  (Doc. 85).  Without moving to set aside their default, Saguaro Desert Trust and Steinberger as Trustee filed an answer.  (Doc. 90).  Deutsche Bank as Trustee then filed a motion for default judgment against M&I Marshall & Illsley Bank, Saguaro Desert Trust, and Steinberger as Trustee.  (Doc. 114).  Saguaro Desert Trust and Steinberger as Trustee opposed that motion, arguing their failure to answer the third-party complaint was "based on inadvertence."  (Doc. 126 at 5).  The Court later vacated the defaults of Saguaro Desert Trust and Steinberger as Trustee.  The Court also denied the motion for default judgment, finding the claims against these two third-party defendants should be resolved on their merits.  (Doc. 200).

[3] Prior to that stipulation, but after the case was removed, Steinberger filed a motion in state court seeking return of the bond she posted.  Deutsche Bank as Trustee then filed, in this court, a motion to quash the state court's order returning the bond to Steinberger.  (Doc. 71).  Steinberger opposed that motion.  In resolving the motion, the Court noted Steinberger did not offer a plausible basis for her actions and she "should not have applied to the state court to release the bond funds as that court did not have jurisdiction to grant such relief."  (Doc. 95 at 4).  But at the time the Court resolved the motion to quash, the funds had already been released.  Thus, the motion was denied as moot.

Rate Note, purportedly endorsed in blank." (Doc. 136 at 2). This was a large departure from Steinberger's earlier position, including the position presented to the Arizona Court of Appeals. Prior to the stipulation, Steinberger had repeatedly claimed without explanation that the original loan documents were lost or destroyed. The Court entered an order in line with the parties' stipulation. (Doc. 141 at 2).

In May 2016, most of the remaining parties filed cross-motions for summary judgment. Steinberger as Executor and Steinberger individually seek summary judgment on all of their claims, in their favor on the counterclaim, and on the third-party claims. (Doc. 182 at 2). Deutsche Bank as Trustee, MERS, Ocwen, and OneWest Bank[4] seek summary judgment on all of the claims asserted against them, as well as on their own claims, the counterclaim, and the third-party claim for judicial foreclosure. (Doc. 174).

## ANALYSIS

### I. The Proper Parties

There is one preliminary aspect which the parties have not addressed in detail and the Court has been unable to determine if it impacts resolution of the cross-motions. The note and deed of trust were signed by Perkins and, shortly thereafter, Perkins conveyed the property to Saguaro Desert Trust. While Perkins apparently did not inform anyone of this transfer, assuming Saguaro Desert Trust was a revocable trust, the transfer could not have triggered the acceleration clause. *See* 12 U.S.C.A. § 1701j-3(d)(8) (forbidding lender from accelerating mortgage when transfer is to "inter vivos trust"). Despite transferring the property into the trust, Perkins appears to have remained responsible on the note and Perkins made monthly payments until his death in 2007.

After Perkins' death, Steinberger in her role as trustee of the Saguaro Desert Trust appears to have had control over the property. But Steinberger did not take any immediate action regarding title and the property remained in the trust. As for the note, it

---

[4] OneWest Bank has changed its named to CIT Bank and that is how it is now identified in filings. (Doc. 175 at 11).

remained in Perkins' name and Steinberger never formally assumed it.[5]  (Doc. 175-2 at 54) (Steinberger's deposition where she states she has not assumed the loan). Presumably, that meant the note remained a liability of Perkins' estate.  *See* Dale A. Whitman, *What We Have Learned from the Mortgage Crisis About Transferring Mortgage Loans*, 49 Real Prop. Tr. & Est. L.J. 1, 40 (2014) (noting land may descend to heir "while the promissory note passes to the personal representative").

Approximately eighteen months after Perkins' death, Steinberger filed an application with the Superior Court to be appointed Perkins' Personal Representative. (Doc. 175-5 at 2).  According to the "Last Will and Testament of Charles Andrew Perkins" filed with the Superior Court, Perkins gave his "entire estate in equal shares to [his] children," Steinberger and John Michael Perkins.  (Doc. 175-5 at 6).  Steinberger appears to have served as Perkins' personal representative but there is no evidence the estate was ever closed.  (Doc. 175 at 5).  In fact, the Superior Court's publically available docket reflects the estate was not closed.[6]  According to an order issued by the Superior Court, Steinberger's failure to file a "Petition for Formal Closing or a Status Report" should have led to her removal as personal representative.  (Doc. 175-5 at 28).  With no explanation, that did not happen.  And without some indication the estate was closed, it is unclear what became of Perkins' liabilities, including liability on the note.  Thus, at present it appears Steinberger may be the owner of the property but the note remains a

---

[5] There is substantial confusion regarding what should occur when an individual receives property subject to a deed of trust as a result of a relative's death.  By law, the acceleration clause cannot be invoked in these circumstances.  12 U.S.C. § 1701j-3(d)(3). But at least one court has concluded this does not give individuals an absolute right to assume the promissory note.  *Lance v. Green Tree Servicing, LLC*, No. 3:15-CV-00387-MO, 2016 WL 3647330, at *5 (D. Or. July 7, 2016).  That conclusion conflicts with how Fannie Mae and Freddie Mac view things.  *See* Sarah Bolling Mancini & Alys Cohen, *Surviving the Borrower: Assumption, Modification, and Access to Mortgage Information After A Death or Divorce*, 43 Pepp. L. Rev. 345, 380 (2016) (explaining Fannie Mae and Freddie Mac recognize "qualifying assumptions" that must be permitted).  Regardless, there is no evidence before the Court that Steinberger assumed the note.

[6] The Superior Court's docket reflects no filing in the probate matter after August 1, 2011 when a piece of mail was returned to the court.  *See* http://www.superiorcourt.maricopa.gov/docket/ProbateCourtCases/caseInfo.asp?caseNumber=PB2009-001396.

- 13 -

liability of Perkins' estate.

Given this sequence of events, the identity of the correct party to serve as plaintiff or defendant on the claims is not clear. Steinberger has legal title to the property, meaning she probably is the correct individual to bring the claim seeking to prove Deutsche Bank as Trustee does not have the right to conduct a trustee's sale. But Steinberger has never had any contractual relationship with any of the defendants. Thus, she does not appear to be the proper party and have standing to bring claims for breach of contract, breach of the duty of good faith and fair dealing, or unconscionability. Instead, those claims likely belong to Perkins' estate. Assuming that is the case, Arizona law provides "when an estate is involved in litigation, the personal representative is the proper" party. *Ader v. Estate of Felger*, 375 P.3d 97, 104 (Ariz. Ct. App. 2016). Accordingly, Steinberger as personal representative of Perkins' estate likely is the appropriate person to pursue the claims alleging breach of contract, breach of the duty of good faith and fair dealing, and unconscionability. Of course, it appears Steinberger did not act appropriately in closing out Perkins' estate such that she should have been removed as personal representative. But there are no indications in the record she has been removed. This has made resolution of these motions very difficult, requiring the Court engage in independent research.

But despite Steinberger's lack of compliance with probate law, it appears Steinberger is entitled to act as the personal representative of Perkins' estate. Therefore, the Court will assume the claims belonging to the estate are properly pursued by Steinberger in her representative capacity. And given Steinberger's ownership of the property, she also appears to be the proper party to bring certain claims in her individual capacity. For simplicity, the Court will refer to "Steinberger" regardless of whether the claims at issue belong to her or to Perkins' estate.

## II. Diversity Jurisdiction Exists

In March 2016, the Court called for briefing on whether diversity jurisdiction exists. (Doc. 150). In particular, the Court questioned whether the Court should look to

the citizenship of Deutsche Bank as Trustee or to the citizenship of the underlying trust's beneficiaries.   The parties submitted their positions, with Deutsche Bank as Trustee arguing diversity jurisdiction exists while Steinberger arguing it does not.

In *Americold Realty Trust v. ConAgra Foods, Inc.*, 136 S.Ct. 1012, 1016 (2016), the Supreme Court held "when a trustee files a lawsuit in *her* name, her jurisdictional citizenship is the State to which she belongs—as is true of any natural person."  But when a trust "is sued in *its* name, it takes the citizenship of each of its members."  *Id.*  Thus, if Steinberger sued the trustee, not the trust, the Court need only look to the trustee's citizenship.  *RTP LLC v. ORIX Real Estate Capital, Inc.*, 827 F.3d 689, 691 (7th Cir. 2016) ("When the trustee sues (or is sued), the trustee's citizenship matters.  And when the beneficiary sues or is sued, or a trust litigates in its own name, again the citizenship of the party controls.").

Here, Steinberger filed suit against "Deutsche Bank National Trust Company, as Trustee of the IndyMac INDX Mortgage Loan Trust 2005-AR14."   (Doc. 1-2 at 4). Thus, Steinberger explicitly chose to name the trustee, not the trust, as the defendant. That means the trustee's citizenship controls and it is undisputed the trustee is not a citizen of Arizona.  Based on that, federal diversity jurisdiction exists.

## III.   Steinberger Is Not Entitled to Exclude All of Deutsche Bank as Trustee's[7] Evidence

Steinberger asserts a preliminary evidentiary argument in support of her motion for summary judgment and against the motion filed by Deutsche Bank as Trustee.  This argument is based on a misunderstanding of the Scheduling Order.   According to Steinberger, Deutsche Bank as Trustee did not comply with the Scheduling Order and Rule 26(a)(3) because it did not file and serve its "Pretrial Disclosures" by the date set out in the Scheduling Order.  Steinberger claims this failure means the Court must ignore all of Deutsche Bank as Trustee's evidence and, further (without explanation) that

---

[7] As used in this section, "Deutsche Bank as Trustee" refers to all of the entities Steinberger has sued.

judgment should be entered in her favor.  Steinberger believes that, even on the claims where she bears the burden of proof, Deutsche Bank as Trustee's purported failure to make their "Pretrial Disclosures" means she prevails.  This is not how Rule 26(a)(3) and the Scheduling Order interact nor does it reflect what a party must do to prevail at summary judgment.

The relevant portion of the Scheduling Order, including the accompanying footnote, states:

> The parties shall finally supplement all discovery, including material changes in expert witness opinions and material disclosures, pursuant to FRCP 26(a)(3), of all exhibits to be used and all witnesses to be called at trial, on or before May 6, 2016.  The parties are on notice that this order supersedes the "30 days before trial" disclosure deadline contained in FRCP 26(a)(3).  Therefore, failure to timely supplement pursuant to Rule 26(e), including attempts to include witnesses and exhibits in the Proposed Final Pretrial Order or at trial that were not previously disclosed in a timely manner may result in the exclusion of such evidence at trial or the imposition of other sanctions including dismissal and the imposition of default pursuant to FRCP 37, the Local Rules of Civil Procedure of the District Court, and the inherent power of the Court.

Steinberger interprets this language as imposing a deadline of May 6, 2016, for the parties' to serve and file pretrial Rule 26(a)(3) disclosures.  That is, she argues the parties were required to serve and file by May 6 a list of the witnesses and documents to be used at trial.  Steinberger claims to have served such a list but Deutsche Bank as Trustee did not.  As such, Steinberger seeks an order excluding all of Deutsche Bank as Trustee's evidence as well as default judgment in her favor on her claims and dismissal of the counterclaim and third-party claim.

Steinberger's argument is flawed in that the Scheduling Order's language is intended to ensure timely supplementation of all previous discovery that will be offered at trial.  Rule 26(a)(3) allows a party to provide a list of witnesses and exhibits to be used at trial as late as 30 days before trial, "[u]nless otherwise limited by court order."  Under this rule, and absent a court order, a party could disclose witnesses and exhibits for the first time a mere 30 days before trial.  The Court's Scheduling Order changes this and

requires parties disclose *all* witnesses and evidence by a much earlier date.   The Scheduling Order serves to ensure the parties not wait to disclose trial witnesses and exhibits until the 30 days before trial authorized by Rule 26(a)(3).   But in reality the disclosures of these witnesses and exhibits for trial will occur when the parties prepare the Joint Proposed Pretrial Order.

Steinberger's reading of the Court's Scheduling Order is idiosyncratic.   If the parties were required to provide lists of the witnesses and exhibits to be used at trial no later than May 6, 2016, those lists would precede the filing of dispositive motions which could (and likely would) narrow the claims for trial.   Requiring a list of trial witnesses and exhibits before dispositive motions have been filed or resolved is not a sensible reading of the Scheduling Order and the Federal Rules.   *See United States v. Combs*, 379 F.3d 564, 569 (9th Cir. 2004) ("[W]e are not required to interpret a statute in a formalistic manner when such an interpretation would produce a result contrary to the statute's purpose or lead to unreasonable results.").   Steinberger is incorrect that Defendants have failed to comply with the Scheduling Order and Rule 26(a)(3).   Defendants made the required disclosures and supplemented them.

Finally, assuming Steinberger's interpretation were correct, she would not be entitled to judgment in her favor on the claims she is asserting because she bears the burden of proof on her claims.   *See, e.g.*, *Gipson v. Kasey*, 150 P.3d 228, 230 (2007) (plaintiff alleging negligence bears burden of proof to establish necessary elements).   A summary judgment movant must show the undisputed evidence establishes there is no genuine dispute of fact and the party is entitled to judgment in her favor.   Meaning, Steinberger has to prove the validity of her claims.   *See, e.g.*, *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000) (noting "nonmoving party has no obligation to produce anything" if moving party has not carried burden).   Steinberger's argument that exclusion of Deutsche Bank as Trustee's evidence automatically entitles her to judgment in her favor is incorrect.   Thus, Steinberger's evidentiary argument fails not only because it is based on a misreading of the Scheduling

1    Order but also because it is not in accordance with basic summary judgment law.

2    **IV.  Deutsche Bank as Trustee's Counterclaim for Judicial Foreclosure is Timely**

3            Steinberger asserts Deutsche Bank as Trustee waited too long to pursue its claim
4    for judicial foreclosure.  If that were true, Steinberger would likely be entitled to some
5    form of judgment that Deutsche Bank as Trustee was prohibited from foreclosing on her
6    property.  Therefore, the timeliness of Deutsche Bank's claim for judicial foreclosure is a
7    threshold matter which must be resolved before addressing other arguments going to the
8    merits.

9            The claim for judicial foreclosure is a state-law claim and the Court must apply
10   Arizona's substantive law.  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427
11   (1996) ("[F]ederal courts sitting in diversity apply state substantive law . . . .").  This
12   includes construction and application of the relevant statute of limitations.  *Albano v.*
13   *Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011).  In doing so, the primary
14   consideration is guidance from Arizona Supreme Court.  *See Bozzio v. EMI Grp. Ltd.*,
15   811 F.3d 1144, 1151 (9th Cir. 2016).  If the Arizona Supreme Court has not addressed a
16   particular issue, the Court must predict how that court would decide the issue.  When
17   making this prediction, the Court should look to "intermediate appellate court decisions,
18   decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *In re*
19   *Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990).  When there is an intermediate appellate
20   court decision on point, the Court is "obligated to follow" that decision.  *Id.*  This
21   obligation, however, does not have the same force when the relevant intermediate
22   appellate court decision is unpublished.  In that situation, a federal court must "consider"
23   the unpublished decision as an indication of the proper interpretation of Arizona law.
24   *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir.
25   2003); *Beeman v. Anthem Prescription Mgmt., LLC*, 689 F.3d 1002, 1008 n.2 (9th Cir.
26   2012).

27          The parties agree Arizona law provides a six-year limitations period for a judicial
28   foreclosure claim.  *See* A.R.S. § 33-816 (trustee's sale must commence within the statute

of limitations for contracts); A.R.S. § 12-548 (six-year statute of limitation for written contracts).  Steinberger argues Deutsche Bank as Trustee waited more than six years after its claims accrued such that the claim is time-barred.  Arizona law is not clear on how the time calculation should occur.  But based on unpublished Arizona authority, and authority from other jurisdictions, the Arizona Supreme Court likely would adopt a rule that renders the counterclaim timely.

For installment obligations with an optional acceleration clause, Arizona applies the limitations period in two ways.  First, an action accrues and "the statute of limitations runs against each installment from the time it becomes due." *Navy Fed. Credit Union v. Jones*, 930 P.2d 1007, 1009 (Ariz. Ct. App. 1996).  Under a standard thirty-year note, this means the statute of limitations may not run on the final installment payment until thirty-six years after the note is signed.  The second way the limitations period may apply is triggered when a lender exercises an acceleration clause.  In that situation, the statute of limitations begins to run on the date a lender exercises "the optional acceleration clause by demanding full payment of the note before all installments became due." *Id.* at 1009.  In brief, collection on the entire debt will be barred six years after the acceleration clause is exercised.

Because an acceleration clause is often exercisable solely at the option of a lender, Arizona courts have made clear a lender must "undertake some affirmative act to make clear to the debtor it has accelerated the obligation." *Baseline Fin. Servs. v. Madison*, 278 P.3d 321, 322 (Ariz. Ct. App. 2012).  For example, acceleration of a car loan occurs when a lender repossesses a car.  *Id.* at 324.  But accepting that a lender may exercise an acceleration clause—and thereby start the statute of limitations—does not necessarily mean acceleration by the lender is irrevocable.

The Court has been unable to identify any decision by the Arizona Supreme Court recognizing a lender's ability to revoke acceleration and, if a lender has that ability, what must the lender do to accomplish a revocation.  The only Arizona authority addressing revocation of acceleration is an unpublished decision by the Arizona Court of Appeals.

*Wood v. Fitz-Simmons*, No. 2 CA-CV 2008-0041, 2009 WL 580784, at *2 (Ariz. Ct. App. Mar. 6, 2009).  In that decision, a lender had accelerated all amounts due on a promissory note by filing a lawsuit seeking to recover the entire amount.  The lender did not pursue that lawsuit and it was dismissed two years later.  The lender then accepted some partial payments and, more than six years after the initial acceleration, the borrower filed suit arguing any further attempts to collect on the debt were barred by the statute of limitations.  The lender argued it had revoked its earlier acceleration of the debt by accepting partial payments or by allowing its lawsuit to be dismissed.  The Arizona Court of Appeals disagreed.

The *Wood* court began its analysis by accepting the principle that lenders can revoke acceleration but holding "[a]n affirmative act by the lender is necessary" for a revocation to be effective.  *Id.*  The court provided very little guidance about the types of affirmative acts that were sufficient.  Instead of examples of sufficient acts, the court merely held "a trial court's dismissal" of a suit seeking the entire accelerated amount is not enough to revoke acceleration nor is acceptance of partial payments.  *Id.*  The reasoning in *Wood* is in line with cases from many other jurisdictions.

The Southern District of Texas recently recognized "[o]ther jurisdictions generally allow rescission of acceleration."  *Callan v. Deutsche Bank Trust Co. of Americas*, 93 F. Supp. 3d 725, 735-36 (S.D. Tex. 2015).  Those jurisdictions include Arkansas, Florida, Illinois, Missouri, Minnesota, Nevada, and Oregon.  *Id.*  In addition, treatises recognize revocation of acceleration as a well-established principle.  *See* 11 Am. Jur. 2d Bills and Notes § 170 ("The exercise of an option to accelerate is not irrevocable . . . .").  Based on the *Wood* decision, decisions from other jurisdictions, and treatises, the Court is confident the Arizona Supreme Court would specifically hold revocation of acceleration a is permissible.  That leaves determination of the circumstances under which revocation of acceleration would be recognized.

At bottom, *Wood* concluded a lender must take some "affirmative act" to indicate revocation of acceleration.  2009 WL 580784, at *2.  In support, *Wood* cited decisions

from Oregon and New York.  Those decisions provide unusually clear situations of either a sufficient act of revocation or an insufficient act.  The Oregon case involved a lender that had accelerated the debt but later executed and recorded a "Rescission of Notice of Default."  *W. Portland Dev. Co. v. Ward Cook, Inc.*, 424 P.2d 212, 213 (Or. 1967).  The Oregon court found that recorded notice sufficient to revoke acceleration.  By contrast, the New York case involved a record "barren of any affirmative act of revocation."  *Fed. Nat. Mortg. Ass'n v. Mebane*, 618 N.Y.S.2d 88, 89 (N.Y. App. Div. 1994).  The present case presents a somewhat more ambiguous situation.  And while other jurisdictions agree an "affirmative act" is needed to revoke acceleration, the decisions in other jurisdiction do offer clear guidance on what type of acts will suffice.

In a case involving a lender that had voluntarily dismissed a lawsuit seeking judicial foreclosure, the Supreme Court of Nevada held a lender must commit an affirmative act that "clearly communicate[s]" the revocation to the borrower.  *Cadle Co. II v. Fountain*, 281 P.3d 1158 (Nev. 2009).  The court went on to note a lender intending to revoke acceleration should do "so in a writing documenting the changed status" and dismissing a lawsuit on the debt is not sufficiently clear to revoke acceleration.  *Id.*  Cases from the Fifth Circuit also require an affirmative act by the lender but the threshold for a sufficient act is very low.  For example, a lender "requesting payment on less than the full amount of the loan" may be sufficient to revoke acceleration.  *Martin v. Fed. Nat. Mortg. Ass'n*, 814 F.3d 315, 318 (5th Cir. 2016).[8]  One treatise agrees the threshold for finding revocation should be very low, including acts such as accepting late payments or even by "mere inaction after default."  *See* 11 Am. Jur. 2d Bills and Notes § 170 (revocation may be express or implied).

Neither Steinberger nor Deutsche Bank as Trustee cite to authority providing a definitive framework for determining the acts necessary to revoke an acceleration.  But

---

[8] Texas law does not use the term "revocation" when discussing the issue.  Instead, it speaks of a lender having the ability to "abandon acceleration."  *Khan v. GBAK Properties, Inc.*, 371 S.W.3d 347, 353 (Tex. App. 2012).  In context, revocation and abandonment appear to be the same concept and Texas allows a lender to abandon acceleration through an "agreement or actions."  *Id.* at 356.

based on *Wood* and guidance from outside Arizona, the Court finds the Arizona Supreme Court would likely recognize the general rule that revocation of acceleration may occur when a lender commits an affirmative act to revoke acceleration.  As for the type of affirmative act necessary, Arizona law does provide acceleration of a debt requires an affirmative act that "make[s] clear to the debtor it has accelerated the obligations." *Baseline*, 278 P.3d at 322.  Sensibly, that same requirement should apply to revocation of acceleration.  That is, revocation of acceleration occurs when a lender takes an affirmative act that places the borrower on actual or constructive notice of the revocation.[9]  Applying this to the present facts is straightforward.

On January 5, 2009, IndyMac Federal sent a letter to Perkins stating his loan was in "serious default" and he had "the right" to cure that default if, by February 6, 2009, he paid off the missed monthly payments.  The letter clearly warned that if Perkins did not cure the default, IndyMac Federal would "accelerate [his] mortgage."  (Doc. 183-4 at 4).  Steinberger did not cure the default and, on February 17, 2009, QLS recorded a Notice of Trustee's Sale, setting the sale for May 19, 2009.  (Doc. 175-22).  Based on these events, the parties agree that sometime between February 6, 2009, and February 17, 2009, the note was accelerated.[10]  In light of Arizona law that the acceleration must be made clear

---

[9] At oral argument, Steinberger's counsel took issue on whether constructive notice was sufficient.  But counsel offered no explanation, legal or otherwise, why constructive notice would not be sufficient.  Given that this case involves interests in land, constructive notice makes abundant sense when applying Arizona law.  *See Chantler v. Wood*, 430 P.2d 713, 716 (Ariz. 1967) ("The purpose of the recording statute is to create notice in the form of constructive notice so that a party or his transferee may not claim to be a subsequent purchaser for value without notice.").

[10] Based on her arguments, it is unclear why Steinberger asserts the note was properly accelerated.  She repeatedly and steadfastly says that she does not know who has the authority to collect on the note and, at the very least, none of the present defendants possess such authority.  But if that were true, then the note was *not* properly accelerated.  The undisputed evidence shows the note and deed of trust were transferred to Deutsche Bank as Trustee a few weeks after being executed.  Thus, Steinberger's argument that the note was properly accelerated in February 2009 requires that acceleration was accomplished by an authorized agent for Deutsche Bank as Trustee.  For her statute of limitations argument, Steinberger accepts that an authorized agent could legally accelerate the note.  But Steinberger would then claim that Deutsche Bank as Trustee does not have the authority to conduct a trustee's sale.  Steinberger offers no explanation for these obviously conflicting positions.  In any event, because Steinberger is adamant that the note was properly accelerated by agents of Deutsche Bank as Trustee, it is

- 22 -

to the debtor, the recording of the Notice of Trustee's Sale likely is the correct date as that is when Steinberger received constructive notice of acceleration.  *See Baseline*, 278 P.3d at 322.  Thus, under a six-year limitations period, and absent further developments, suit on the accelerated amounts was due no later than February 17, 2015.

Applying the Court's anticipation of the Arizona Supreme Court's interpretation of Arizona law, a valid revocation of the acceleration could occur if Deutsche Bank as Trustee took an "affirmative act" sufficient to place Steinberger on notice of the revocation.  On May 29, 2012, QLS executed and recorded a Cancellation of Trustee's Sale.  (Doc. 175-20 at 2).  And on August 23, 2012, IndyMac Home Loan Servicing sent a letter unambiguously stating the loan was "in serious default" but Steinberger had a right to cure the default by paying the past-due amounts, *i.e.*, not the entire loan balance. (Doc. 175-19 at 2).  That letter also stated if Steinberger did not cure the default, IndyMac Home Loan Servicing "may accelerate your mortgage, and the full amount you owe will become due and payable."  (Doc. 175-19 at 3).  Either one of these acts was sufficient to revoke the acceleration.

Recording a notice of Cancellation of Trustee's Sale gave Steinberger either actual or constructive notice that Deutsche Bank as Trustee was no longer actively seeking to conduct a trustee's sale to recover the entire balance owing.[11]  Alternatively, the letter identifying the past-due amounts, but giving Steinberger the opportunity to cure for less than the entire balance, made clear to her the entire loan was no longer accelerated.  The letter allowed for no ambiguity in explaining that IndyMac Home Loan Servicing might "accelerate [the] mortgage" if no payment were made.  Obviously an accelerated loan cannot again be accelerated and the loan was not accelerated at the time of the letter.

---

difficult to believe she acts in good faith in arguing that she has no idea who is the proper party to enforce the note.

[11] As referenced in note 9, constructive notice is sufficient.  The Arizona Supreme Court has long recognized that "[p]ublic records are, of course, notice to all persons of the existence and contents of their properly recorded documents."  *Butler v. Quinn*, 14 P.2d 250, 252 (Ariz. 1932).  And Steinberger offers no reason to depart from this well-established principle of Arizona law.

Drawing all reasonable inferences in Steinberger's favor, the cancellation of the trustee's sale together with the letter were more than sufficient to place her on notice that the acceleration had been revoked.  Therefore, the counterclaim filed in 2015 was timely.[12]

It is not clear which portions of the foregoing analysis Steinberger disagrees with. It appears Steinberger agrees Arizona law allows for revocation of acceleration and that some affirmative act is necessary for revocation to occur.  But Steinberger claims the recorded cancellation of the trustee's sale and the August 2012 letter do not qualify as "affirmative acts" of revocation.  She does not explain why, merely stating such actions could not have (in her words) "magically decelerated the debt."  (Doc. 198 at 12).  But revocation of acceleration does not require magic.  Rather, an affirmative act placing Steinberger on notice is satisfactory.  Viewed separately, either the recorded cancellation of the trustee's sale and the August 2012 letter was enough.  But, at the very least, these events together were sufficient to revoke acceleration.

Steinberger's primary argument against this conclusion is that even if Arizona law allows for revocation of acceleration, it would not allow revocation when there has been detrimental reliance.  Other jurisdictions recognize detrimental reliance can prevent an attempt to revoke acceleration.  *Callan v. Deutsche Bank Trust Co. Americas*, 93 F. Supp. 3d 725, 735 (S.D. Tex. 2015) (citing cases).  But there is very limited authority recognizing detrimental reliance.  *Id.*  And the most often cited case for not allowing revocation of acceleration due to detrimental reliance involved a borrower who had

---

[12] Deutsche Bank as Trustee does not rely solely on revocation of acceleration to establish timeliness of its counterclaim.  Among other arguments, Deutsche Bank as Trustee claims it is also entitled to equitable tolling such that its counterclaim filed one month after the limitations period expired should still be considered timely.  In brief, Deutsche Bank as Trustee's argument is that Steinberger falsely filed a bankruptcy petition the day before a trustee's sale was scheduled to occur.  That filing could not have been in good faith as Steinberger impersonated her deceased father in order to justify its filing.  Therefore, Deutsche Bank as Trustee argues it is entitled to tolling while the wrongful bankruptcy petition prevented a trustee's sale.  In addition, Steinberger obtained orders from the state courts preventing any trustee's sale from occurring.  Those orders remained in place for years.  Deutsche Bank as Trustee argues the limitations period should not be considered to run during the time it was legally prohibited from pursuing its rights by way of a trustee's sale.  Were it necessary for the Court to reach the issue, equitable tolling likely would be appropriate for at least some of these time periods, such that Deutsche Bank as Trustee's claim for judicial foreclosure was still timely.

already taken out a new mortgage on the property when the previous lender attempted to revoke acceleration. *Id.* at 735. In at least one case, pursuing litigation was not a sufficient form of detrimental reliance. *See id.* at 737-38.

Steinberger claims the initial acceleration resulted in her incurring a variety of costs, most important, the cost of litigation. Under this reasoning, Deutsche Bank as Trustee could not revoke the acceleration in 2012. The problem with Steinberger's claimed reliance is that, in this case, pursuing losing litigation cannot be viewed as a permissible form of detrimental reliance. Steinberger filed this suit alleging Deutsche Bank as Trustee did not have the authority to conduct a trustee's sale of her home. But as set forth in detail below, none of Steinberger's theories are supported by facts and Deutsche Bank is, in fact, entitled to foreclose. Thus, Steinberger's purported reliance was in the form of litigation costs merely to establish she does not, in fact, have any meritorious claims. Moreover, Steinberger has remained in possession of the property and has made no payments for approximately six years. Accordingly, Steinberger's alleged detrimental reliance was accompanied by a significant advantage to her of approximately $4,000 per month. Steinberger has not provided a sufficient basis for finding detrimental reliance, meaning the revocation in 2012 was permissible and the claim for judicial foreclosure is timely.[13]

## IV. Count 7—Unconscionable Contract[14]

In addition to timeliness, another issue that could potentially impact claims

---

[13] The timing of this case does mean that some monthly payments may be barred by the statute of limitations. Thus, Deutsche Bank as Trustee must not seek judgment on any amounts which would have been paid under those payments and which are now barred by the statute of limitations.

[14] Deutsche Bank as Trustee argues the "doctrine of unconscionability has no application to secured transactions." (Doc. 174 at 29). The Arizona Supreme Court, however, has discussed the doctrine at great length in the context of a secured transaction. *Maxwell v. Fid. Fin. Servs., Inc.,* 907 P.2d 51, 59 (Ariz. 1995). Therefore, Deutsche Bank as Trustee's argument regarding the inapplicability of the doctrine appears misplaced. Deutsche Bank as Trustee also argues the unconscionability claims, and any other claims based on misconduct by IndyMac Bank are barred by the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"). Deutsche Bank as Trustee did not raise FIRREA earlier and, while the defense may not be formally waived, the Court need not address it as Steinberger's claims fail on their merits.

asserted by both sides is the alleged unconscionability of the underlying note.[15]   The Arizona Court of Appeals concluded Steinberger had alleged sufficient facts to support a claim for both "procedural unconscionability" as well as "substantive unconscionability."[16]  *Steinberger v. McVey ex rel. Cty. of Maricopa*, 318 P.3d 419, 436 (Ariz. Ct. App. 2014).   At oral argument, Steinberger's counsel claimed she has now proven all the facts alleged in her complaint.  Therefore, in Steinberger's view, she has prevailed.  That is not the law.  Merely alleging sufficient facts to state claims for relief does not mean Steinberger will prevail if she proves all those facts.  Unconscionability requires a court "examine each transaction on its own facts."  *Duenas v. Life Care Centers of Am., Inc.*, 336 P.3d 763, 768 (Ariz. Ct. App. 2014).   Thus, even though Steinberger's complaint was deemed sufficient, resolution of the merits depends on the underlying evidence and whether other aspects of the transaction negate a finding of unconscionability.  *See id.* (weighing multiple factors).

As noted by the Arizona Supreme Court, the determination of unconscionability is to be made by the court as a matter of law."  *Maxwell v. Fid. Fin. Servs., Inc.*, 907 P.2d 51, 56 (Ariz. 1995).  In making this determination, the court may make factual findings, although it need not "hold a separate, formal evidentiary hearing."  *Id.*  Instead, the court must provide the parties with a "reasonable opportunity to present evidence," such as summary judgment proceedings.  *Id.*  Here, the parties had ample opportunity to submit evidence regarding unconscionability and the following are the Court's factual and legal

---

[15] Steinberger's unconscionability arguments focus on the note not the deed of trust.  The Court will do the same.

[16] While Arizona courts often refer to "claims of unconscionability," it is not entirely accurate to describe allegations of unconscionability as supporting claims for relief.  *See Maxwell v. Fid. Fin. Servs., Inc.*, 907 P.2d 51, 56 (Ariz. 1995).  Instead, unconscionability is usually viewed as a defense to enforcement of a contract.  *Id.* at 57 (unconscionability "work[s] primarily as a defense both in law and in equity").  *See also Johnson v. Long Beach Mortgage Loan Trust 2001-4*, 451 F. Supp. 2d 16, 36 (D.D.C. 2006) ("[U]nder the common law a court can do no more than refuse enforcement of the unconscionable section or sections of the contract but cannot award either restitution or money damages.").  Presumably when they discuss "claims of unconscionability" the Arizona courts mean that a plaintiff can seek declaratory relief that the contract at issue is not enforceable.  *See id.* (discussing unconscionability as basis for declaratory relief).

1   conclusions.

2       **A.  Procedural Unconscionability**

3       "Procedural unconscionability is concerned with 'unfair surprise,' fine print

4   clauses, mistakes or ignorance of important facts or other things that mean bargaining did

5   not proceed as it should."  *Maxwell*, 907 P.2d at 57–58.   When assessing procedural

6   unconscionability, a court must look to a long list of non-exhaustive "factors" to

7   determine if something went wrong or was unfair in the bargaining process.   Those

8   factors include: "age, education, intelligence, business acumen and experience, relative

9   bargaining power, who drafted the contract, whether the terms were explained to the

10  weaker party, whether alterations in the printed terms were possible, [and] whether there

11  were alternative sources of supply for the goods in question."   *Id.*   Other factors are

12  "whether the contract was separate from other paperwork, whether the contract used

13  conspicuous typeface, and whether the contract was signed hurriedly and without

14  explanation in emergency circumstances."  *Duenas v. Life Care Centers of Am., Inc.*, 336

15  P.3d 763, 768 (Ariz. Ct. App. 2014).

16      The record contains very little support for Steinberger's procedural

17  unconscionability claim.  Perkins was the significant and material individual involved in

18  the bargaining process such that he would have provided the crucial information

19  regarding what, if anything, went wrong or was unfair during the process.  But Perkins

20  died in 2007 and there is no evidence he believed the contract was unconscionable at the

21  inception or during his lifetime.  While Steinberger was with Perkins when he signed the

22  paperwork, she is not able to remember the events of that day in any material detail.  And

23  no other witness with knowledge of what happened that day has been identified.  Thus,

24  there is simply very little evidence for the Court to review and determine whether the

25  bargaining process was flawed.

26      The meager information available shows Perkins was 87 years old at the time he

27  signed the note, he did not draft the note, and he was presented with a form note such that

28  he could not alter its terms.  These facts lend some support to a finding of procedural

unconscionability.  The record shows, however, that Perkins, by his own words, had substantial experience in real estate transactions.  At the time he signed the note, Perkins already owned four other pieces of property, three of which were generating rental income.  (Doc. 175-6 at 4).  In addition, given his experience with four other properties—two of which had monthly "mortgage payments"—if Perkins wished to seek a mortgage through another lending source, he likely could have and would have done so.  That is, there were ample "alternative sources" he could have pursued.  *Maxwell*, 907 P.2d at 57–58.  Finally, Steinberger testified that Perkins did not quickly sign the documents and the transaction was clearly not conducted under "emergency circumstances."  *Duenas*, 336 P.3d at 768.   (Doc. 175-2 at 22) (Steinberger's deposition denying Perkins was "quickly signing").   These circumstances tend to show the note was not procedurally unconscionable.

Steinberger's main argument regarding procedural unconscionability involves the loan disclosure allegedly presented to Perkins for the first time on the day of the closing. That loan disclosure differed significantly from the loan disclosure Perkins had received a few weeks earlier.  This argument is, in effect, that the provisions of the note were an unfair surprise.  The circumstances of Perkins executing the note, however, negate a finding of surprise.

As noted earlier, Perkins initially received a Truth-In-Lending Disclosure showing a thirty-year loan in the amount of $532,000 with an annual percentage rate of 1%.  (Doc. 183-2 at 37).  Given his substantial experience in real estate, there is some doubt Perkins expected to receive this rate.   But regardless of Perkins' possible knowledge, the documents at closing made clear the actual terms of the note.  Those terms included an initial rate of 1% for one month, that the rate could change each month, and the rate could increase up to 9.95%.   There is no evidence of an effort to hide these changes at the closing.  If anything, efforts were made to highlight them.  The top of the first page of the note indicates, in all capital letters and in a substantially larger font than used throughout the rest of the note, that it is an "Adjustable Rate Note."  (Doc. 175-3 at 2).  The note then

has bolded section headings titled "Interest Rate Change Dates" and "Interest Rate Limit." (Doc. 175-3 at 2). In addition, Perkins signed a separate three-page document titled "Adjustable Rate Mortgage Loan Program Disclosure." (Doc. 175-8 at 2). That document explains Perkins' interest rate and that his payment might change and examples are provided of how other provisions of the note may impact his future liability. A well-publicized change in terms is not enough, standing alone, to support a cognizable claim of "unfair surprise." And because Perkins is not available, Steinberger does not have any evidence of whether Perkins was aware of this well-publicized change. Accordingly, the claim of unfair surprise is not convincing.

Finally, instead of pointing to evidence regarding the bargaining process, Steinberger has repeatedly claimed it is somehow relevant that Perkins died from dementia two years after he signed the note. Steinberger apparently believes this should establish Perkins' mental state at the time he signed the note. During her deposition, however, Steinberger explained that in 2005 Perkins would "repeat things sometimes" but that might have been "old age forgetfulness" not dementia. (Doc. 175-2 at 32). She also described Perkins as sharp "for the most part" in 2005 and she could not remember having any "specific concerns" about his mental state when he signed the note. (Doc. 175-2 at 32). In addition, as of 2005 Perkins was still making decisions for himself and caring for himself. In short, there is no evidence Perkins was meaningfully mentally impaired in 2005.

Steinberger has not established the bargaining process was inappropriate. Her procedural unconscionability claim fails.

### B. Substantive Unconscionability

"Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." *Maxwell v. Fid. Fin. Servs., Inc.*, 907 P.2d 51, 58 (Ariz. 1995). The factors to consider for substantive unconscionability include whether the "contract terms [were] so one-sided as to oppress or unfairly surprise an innocent party," whether there is "an overall imbalance in the

obligations and rights imposed by the bargain," and if there is a "significant cost-price disparity." *Id.*

Steinberger's substantive unconscionability arguments overlap with her procedural arguments in that she claims the interest rate and negative amortization features of the note were unfairly surprising and oppressively one-sided. These claims suffer the same flaw as the arguments regarding procedural unconscionability: the lack of supporting evidence. Starting with allegations of unfair surprise, Steinberger has no evidence of what Perkins knew at the time or that he was "surprised" by these terms. The only relevant evidence which is undisputed is that Perkins had been an experienced investor with multiple mortgages. The paperwork plainly explained the features of the note and the Truth-In-Lending Disclosure Statement indicated Perkins' payment would increase to $3,476.55 in 2010. (Doc. 175-9 at 2). If Perkins were truly surprised by the features of the note, he likely would have expressed that surprise at some point in time. There is no such admissible evidence. In short, Steinberger has not met her burden of showing unfair surprise. *Duenas v. Life Care Centers of Am., Inc.*, 336 P.3d 763, 770 (Ariz. Ct. App. 2014) (burden is on party arguing substantive unconscionability).

Turning to the possibility that the note was oppressively one-sided, again Steinberger fails to provide convincing evidence to succeed on her motion. Steinberger points to four specific features of the note as substantively unconscionable: 1) the 1% interest rate would only apply for one month; 2) paying the amount listed in the note would result in an increasing principal balance; 3) once a certain amount of interest had accumulated, the payment would substantially increase; and 4) no one explained these terms to Perkins before he agreed to them. The last feature speaks more to procedural unconscionability and the element of unfair surprise discussed above. Therefore, the focus will be on the first three. Given Perkins' financial situation, these three features were not sufficiently one-sided or oppressive.

As explained by Deutsche Bank as Trustee, there are legitimate reasons why an individual may enter into a note with the features Steinberger now complains about.

(Doc. 174 at 28).  A low starting interest rate, even if it were only for one month, together with an escalating principal balance, might allow an individual to make substantially lower monthly payments than would be required under a more conventional loan. Therefore, if the borrower planned on the market value of the home increasing, the borrower may have also expected to sell at a profit the home before the payments increased.  Also known as speculating in real estate, which Steinberger's counsel alluded to at oral argument.  (Doc. 209 at 32) ("[E]verybody had one, two, three, four homes."). In other words, the type of note Perkins executed would allow an individual to live in a more expensive home than would be affordable under a fixed-rate conventional note. Features that provide additional opportunity to buyers were not then and are not now shocking or irrational.

In addition, even if these features may be cause for concern in some scenarios, Perkins presented a unique situation.  He was far from indigent and disadvantaged.  In the loan application, Perkins stated he had a monthly income of over $10,000.[17]  With that large of monthly income, the possibility that payments on the note might increase from under $2,000 to approximately $4,000 is not overly concerning.  Moreover, Perkins represented to the financial institution that he had $435,000 cash on hand and $985,000 in other assets.  Entering into a loan where the monthly payment might increase over time to approximately $4,000 is far from oppressive to such an individual.  Steinberger has fallen well short of establishing any substantive unconscionability.[18]

---

[17] Steinberger has repeatedly described the financial figures in Perkins' loan application as incorrect.  (Doc. 192 at 29).  Steinberger has failed, however, to point to evidence establishing the figures were incorrect at that time nor has she offered correct figures now.  Given that she bears the burden of proving unconscionability, one would expect her to be ready and willing to establish Perkins' financial situation as of 2005. Steinberger has not done so.  The only evidence regarding Perkins' financial situation comes from his loan application and Perkins signed the application attesting to the figures' accuracy.  Steinberger has plainly failed to offer contradictory evidence. Therefore, the figures from the loan application are the only relevant evidence.

[18] Steinberger's unconscionability arguments are not supported by evidence but it appears she is confused about the nature of relief she would receive if she had succeeded on her unconscionability arguments.  Steinberger argues that if she were to prove the note was unconscionable, Deutsche Bank would have to "mark the Note 'satisfied'" and "release the DOT through a recording."  (Doc. 182 at 28).  In other words, Steinberger

1      Steinberger has not established the note was procedurally or substantively

2    unconscionable.  Therefore, the unconscionability claims fail.

3    **V.  Count 8—Payment/Discharge**

4       In addition to alleging the note was unconscionable, Steinberger also alleged a

5    claim she described as "payment/discharge."  This claim is based on the allegation that

6    someone made payments on the note.  At times Steinberger argues those payments only

7    decreased Perkins' liability on the note but other times she argues someone completely

8    paid off the note such that Deutsche Bank as Trustee is not entitled to conduct any

9    collection activities.  The Arizona Court of Appeals determined Steinberger had stated a

10   "payment/discharge" claim based on the allegations that the FDIC had reimbursed the

11   note holder based on Perkins' default.  *Steinberger v. McVey ex rel. Cty. of Maricopa*,

12   318 P.3d 419, 438 (Ariz. Ct. App. 2014).  In support of this conclusion, the court of

13   appeals noted an Arizona statute provides "an instrument is paid to the extent payment is

14   made by or on behalf of a party obliged to pay the instrument."  *Id.* at 439 (quoting

15   A.R.S. § 47-3602).  Because Steinberger concedes she has not made any payments in

16   many years, the crucial question is whether someone has made payments "on [her]

17   behalf."  Steinberger has no evidence to show someone was making payments on her

18   behalf.  As such, her arguments are mere fanciful speculation.

19      Viewing Steinberger's alleged evidence in the light most favorable to her, it is far

20   from clear that payments were, in fact, ever being made on the note.  But the Court will

21   accept Steinberger's allegation for the moment and assume some unknown person or

22   entity was making payments.  The problem for Steinberger is that she does not point to

23   any reliable and admissible evidence that those payments were made on her behalf.[19]  If

24

---

25   apparently believes that if the note were declared unconscionable, she would be entitled
to keep the $532,000 Perkins received as a result of the note and remain in possession of

26   the property.  She cites no law in support of such a result and Arizona law appears to
foreclose such a windfall result.  *See, e.g.*, *Caruthers v. Underhill*, 326 P.3d 268, 273

27   (Ariz. Ct. App. 2014) ("The election-of-remedies doctrine provides that a party . . . [to] a
contract must choose to either disavow the contract and seek a return to the *status quo*

28   *ante*, or affirm the contract and sue for damages for breach.").

[19] Deutsche Bank offers evidence the payments were not made on Steinberger's

someone were making payments on her behalf, presumably Steinberger would know who, exactly, was doing so.  In sum, Steinberger does not point to evidence establishing these payments were made on her behalf, that she had an agreement with someone to make payments, or that Deutsche Bank as Trustee treated these payments as made on her behalf.  In fact, the evidence is that Deutsche Bank as Trustee does not consider any payments as made on Steinberger's behalf.  Steinberger's theory that some unidentified Good Samaritan is making payments on the note on her behalf has no basis in the evidence.  Her payment/discharge claim fails.

## VI.  Steinberger's Claims 1, 2, and 3 and Deutsche Bank as Trustee's Counterclaim for Judicial Foreclosure

Having rejected Steinberger's claims going to the enforceability of the note, the Court can turn to Steinberger's core claims.  Unfortunately, those claims have, from the very beginning, been exceptionally difficult to understand.[20]  The Arizona Court of Appeals described the main assertions in the Steinberger complaint as claims to "Vacate/Void Notice of Trustee's Sale."  *Steinberger*, 318 P.3d at 426.  These claims were based on Deutsche Bank as Trustee, and numerous related entities, lacking "the authority to conduct a trustee's sale of her home."  *Id.*  The *Steinberger* court reasoned Arizona law requires a valid chain of assignments regarding the deed of trust and

behalf.  (Doc. 175 at 15).  Steinberger objected to that evidence, claiming the supporting witness was not "competent to provide evidence on any alleged amounts due under the [note]."  (Doc. 193 at 16).  The Court need not resolve this issue as Steinberger bears the burden of proof on this issue, meaning she was required to offer evidence supporting her claim to survive summary judgment.

[20]  Steinberger's own motion for summary judgment shows the extent of her confusion.  That motion claims to seek summary judgment on "all counts of the second amended complaint."  (Doc. 182 at 1).  But one of her counts is for breach of the duty of good faith and fair dealing.  Steinberger's motion contains no mention of this count.  The only argument regarding this count comes in Deutsche Bank as Trustee's motion and Steinberger's opposition to that motion.  (Doc. 174, 192).  Assuming Steinberger has not abandoned this claim, she seems to be basing it on Deutsche Bank as Trustee trying to enforce the note despite not being entitled to do so.  (Doc. 192 at 23).  As set forth in this section, Steinberger is simply wrong about Deutsche Bank as Trustee's entitlement to enforce the note.  Therefore, the good faith and fair dealing claim fails for the same reasons her other core claims fail: Deutsche Bank as Trustee is entitled to enforce the note.

Steinberger had alleged there was no valid chain of assignments.

Steinberger appears to have abandoned this argument.  Instead, Steinberger is now focused on an argument regarding Deutsche Bank as Trustee's right to conduct a trustee's sale based on the language of the note.  According to Steinberger, Deutsche Bank as Trustee is not identified as the "Note Holder" by the terms of the note itself.  Because only the "Note Holder" is entitled to declare Steinberger in default and conduct a trustee's sale, Steinberger alleges Deutsche Bank as Trustee's attempt to conduct a trustee's sale is inappropriate.  This argument depends on how the note defines "Note Holder" as "anyone who takes this Note by transfer and who is entitled to receive payments under this Note."  (Doc. 175-3 at 2).  Steinberger focuses on this being a conjunctive phrase.  According to Steinberger, only an entity that satisfies *both* of the requirements in the definition of "Note Holder" is entitled to declare a default, accelerate the note, and elect to sell the property.  (Doc. 182 at 21).  Thus, it is not enough to merely take the note by transfer, the entity that holds the note must also be "entitled to receive payments under" the note.

The parties have stipulated that Deutsche Bank as Trustee possesses the original note and there is no genuine dispute of material fact that Deutsche Bank as Trustee took the note by transfer.[21]  Steinberger's argument, therefore, focuses on her belief that Deutsche Bank as Trustee is not "entitled to receive payments" under the note.  This interesting argument does not prevail.

According to Steinberger, her argument depends on what happened shortly after Perkins signed the note and deed of trust.  The parties agree the note and deed of trust were transferred to Deutsche Bank as Trustee in connection with the securitization of the note and deed and trust.  The specifics of that process are set out in the Pooling and Servicing Agreement.  (Doc. 183-3 at 12).  According to that agreement, IndyMac Bank,

---

[21] It is significant to note that in the Arizona Court of Appeals' opinion, the court assumed there was no note.  *Steinberger v. McVey ex rel. Cty. of Maricopa*, 318 P.3d 419, 438 (Ariz. Ct. App. 2014) (Steinberger alleged "the note is not in Respondents' possession and that it was 'destroyed' when it was scanned 'at the time of loan initiation'").

F.S.B., transferred all of its interest in each mortgage loan (including Perkins') to "IndyMac MBS, Inc., a Delaware corporation." (Doc. 183-3 at 54, 23). That transfer included "all interest and principal received or receivable" from the mortgage loans. IndyMac MBS then transferred its interest in the mortgage loans to Deutsche Bank as Trustee "for the benefit of the Certificateholders." (Doc. 183-3 at 54). ("Certificateholders" refers to third-parties investors who purchased certificates in the trust giving them the right to receive anticipated income from the trust.) Deutsche Bank as Trustee held the mortgage loans "in trust for the exclusive use and benefit of all present and future Certificateholders." (Doc. 183-3 at 60). The agreement further contemplated a "Master Servicer" would "service and administer" the loans. In other words, collect payments on the loans. (Doc. 183-3 at 66). The Master Servicer would deposit the collected funds into an account which was maintained by Deutsche Bank as Trustee on behalf of the certificateholders. (Doc. 183-3 at 79) (Master Service deposits to "Distribution Account"); (Doc. 183-3 at 75) ("Distribution Account" maintained for certificateholders). Deutsche Bank as Trustee would then withdraw funds from that account for distribution to certificateholders. (Doc. 183-3 at 81).

Steinberger points to this transaction as establishing the certificateholders "are the ones entitled to enforce the Note" because they are the ones who are "entitled to receive payments" under the note. (Doc. 182 at 21). There are two insurmountable problems with Steinberger's argument. First, the undisputed facts disprove her theory. And second, to the extent necessary, Deutsche Bank as Trustee would qualify as the certificateholders' agent.

The undisputed facts regarding the relationship of Deutsche Bank as Trustee and the certificateholders show Deutsche Bank as Trustee *received* the payments from the entity servicing the loans, took a small percentage, and then passed along the payments made on the note.[22] In other words, Steinberger admits that Deutsche Bank as Trustee is

---

[22] According to Steinberger's version of events, individuals such as Perkins are required to make payments to a loan servicer. (Doc. 181-1 at 14). The servicer then sends the payments to Deutsche Bank as Trustee. (Doc. 181-1 at 14). After taking a very

"entitled to receive payments under" the note, although it only retains a small percentage of the total payments.  The fact that Deutsche Bank as Trustee may have forwarded most of the payments it received to third-parties has no relevance to Steinberger's situation. Deutsche Bank as Trustee remained "entitled to receive payments under" the note regardless of where the balance of each payment eventually ended up.  Deutsche Bank as Trustee's decision to forward payments to third-parties is completely irrelevant.  *See Kentera v. Fremont Inv. & Loan*, No. CV-10-8259-PHX-GMS, 2012 WL 1132760, at *5 (D. Ariz. Apr. 4, 2012) (rejecting argument that payments forwarded "through the trust" meant holder of note was not entitled to payment under the note).

The second problem with Steinberger's note-based argument is that Steinberger's own version of events would, at the very least, establish an agency relationship. Steinberger concedes, as she must, that Deutsche Bank as Trustee's agents were responsible for collecting monthly payments and passing the payments on to third-parties. In performing these tasks, Deutsche Bank as Trustee might be viewed as acting on behalf of the certificateholders.  In other words, even if the Court were to assume the entities "entitled to receive payments under" the note were the certificateholders, Deutsche Bank as Trustee would be acting as their collections agent.  Arizona law has long recognized the collection of payments on a note may require the collector be deemed an actual or implied agent of the entity entitled to receive payments under the note.  *Browne v. Nowlin*, 570 P.2d 1246, 1248 (1977) (title company was agent or implied agent of lender).   Accordingly, assuming counterfactually that Steinberger is correct and the certificateholders are the only entities "entitled to receive payment under" the note, the certificateholders' agent—Deutsche Bank as Trustee—is entitled to act on their behalf.[23]

---

small percentage of the payments, Deutsche Bank sends the payments to Depository Trust Company.  (Doc. 182 at 13) (Deutsche Bank as Trustee takes a fee of 0.002 percent and passes the remainder to Depository Trust Company).   Depository Trust Company then sends the remaining portion of the payments to the certificateholders.

[23] Steinberger also alleges Deutsche Bank as Trustee has not suffered a cognizable injury because only the certificateholders have lost money as a result of her default.  That is incorrect as Deutsche Bank as Trustee is the entity "entitled to receive payments" from Perkins or his successor and it is undisputed Perkins' successor has not made payments.

And in that capacity, Deutsche Bank as Trustee is entitled to take actions regarding Steinberger's property.

The arrangement between Deutsche Bank as Trustee and the certificateholders is irrelevant and, even under an incorrect view of the facts, Steinberger has merely established Deutsche Bank as Trustee is the certificateholders' agent.  Either way, Steinberger's arguments under the terms of the note fails.  This means Steinberger's contract-based claims fail and Deutsche Bank's counterclaim and third-party claim for judicial foreclosure succeeds.[24]

## VII.  Counts 4 and 6—False Recording and Negligence Per Se

Finally, Steinberger believes Deutsche Bank as Trustee has recorded various invalid documents against her property.[25]  Based on this, she asserts two claims: 1) a claim under A.R.S. § 33-420 which provides for statutory damages when "false documents" are recorded; and 2) a claim for "negligence per se."  Steinberger does not have sufficient evidence on either type of claim.

Under § 33-420, "[a] person" can be liable for up to $5,000 for recording a document claiming an interest in real property if the document is "forged, groundless, contains a material misstatement or false claim or is otherwise invalid."  In a number of recent decisions the Arizona Court of Appeals has concluded this language only allows for liability when recorded documents contain "material misstatements."  *Stauffer v. Premier Serv. Mortgage, LLC*, No. 1 CA-CV 15-0026, 2016 WL 5075312, at *3 (Ariz. Ct. App. Sept. 20, 2016) (quoting *Sitton v. Deutsche Bank Nat. Trust Co.*, 311 P.3d 237,

---

But again, even accepting Steinberger's argument does not lead to her being entitled to relief.  Assuming it is the certificateholders who have been injured, they have authorized Deutsche Bank as Trustee to seek redress of that injury on their behalf.

[24] Steinberger has not pointed to evidence establishing the judicial foreclosure would be improper.  Steinberger concedes she has not made payments for more than six years, she has received notice required by the note and deed of trust, and there is no reason to further delay matters by requiring Deutsche Bank as Trustee perform additional acts before foreclosing.

[25] This count is brought against other defendants but, for simplicity, the Court will continue to refer only to Deutsche Bank as Trustee.

243 (Ariz. Ct. App. 2013)).  And the Arizona Court of Appeals has provided a meaning of "material" that makes liability very difficult to establish.

According to the Arizona Court of Appeals, a statement in a recorded document is "material" if, and only if, it would effect "the borrower's obligations or choice of actions."[26]  *Id.*  In other words, regardless of the error in a recorded document, the error is actionable under § 33-420 only if it changes a borrower's options to either "repay the loan according to the terms of the note, to try to renegotiate the terms of the note, or to default and accept foreclosure."  *Id.*

It is difficult to envision what type of error would be "material" under this standard.  It is even more difficult to envision a "material" error when, as here, the property owner admits to not having made monthly payments on the underlying note in many years.  While Steinberger points to a variety of errors in the recorded documents involving her home, none of those errors were material to her because they did not change her options in any way.  *See Kester v. CitiMortgage, Inc.*, 177 F. Supp. 3d 1150 (D. Ariz. 2016) (noting misrepresentations in recorded documents "did not affect [plaintiff's] choices"); *In re Mortg. Elec. Registration Sys. (Mers) Litig.*, No. CV 10-1550-PHX-JAT, 2016 WL 4062854, at *8 (D. Ariz. July 29, 2016) (rejecting § 33-420 claim because "Plaintiffs make no argument that [the] discrepancies impacted them in any way").

At oral argument, Steinberger's counsel claimed § 33-420 only imposes a materiality requirement on "misstatements."  The Arizona Court of Appeals, however, has read § 33-420 as imposing a materiality requirement on misstatements or "falsities." *Stauffer v. Premier Serv. Mortg.*, LLC, 240 Ariz. 503, 382 P.3d 790, 793 (Ariz. Ct. App. 2016).  In addition, another district judge has discussed this theory in great detail and concluded § 33-420 deals exclusively with material errors.  *Kester*, 177 F. Supp. 3d at

---

[26] At oral argument, Steinberger's counsel claimed § 33-420 only imposes a materiality requirement on "misstatements."  The Arizona Court of Appeals, however, has read § 33-420 as imposing a materiality requirement on misstatements or "falsities." *Stauffer v. Premier Serv. Mortg.*, LLC, 240 Ariz. 503, 382 P.3d 790, 793 (Ariz. Ct. App. 2016).

1157.  To read the statute as reaching every possible error would mean the legislature, for example, authorized \$5,000 in statutory damages in the event "the third page of a document is [actually] page two."  *Id.*  That would be a "harsh, purposeless result."  *Id.*  The most sensible construction of § 33-420, and one accepted by the Arizona Court of Appeals, is that materiality is required for all alleged errors.  Steinberger cannot meet that requirement here.

Steinberger's negligence per se theory fails for the same reason.  When ruling Steinberger had stated a claim for negligence per se, the Arizona Court of Appeals concluded a violation of A.R.S. § 39-161—the criminal statute regarding "presentment of [a] false instrument for filing"—could support a negligence per se claim in these circumstances.[27]  *Steinberger*, 318 P.3d at 433.  The court of appeals further stated the criminal "statute is intended to protect anyone who is adversely affected by a cloud on title due to the recording of a false instrument."  *Id.*  The allegedly false recordings here cannot satisfy that standard because they could not have "adversely affected" Steinberger as they were not "material" to her.  That is, the recorded documents—even accepting that they had errors in them—had no effect on her obligations or choice of actions.  In the context of the criminal statute and a claim for negligence per se, this lack of materiality is fatal.  Therefore, the negligence per se claim fails.

**VIII.  Conclusion**

At the conclusion of this lengthy litigation, it appears Steinberger's main theory— that Deutsche Bank as Trustee is not entitled to enforce the note—never had a sound legal or factual basis.  Deutsche Bank as Trustee holds the note, receives payments under

---

[27] There appears to be a conflict in Arizona law regarding whether A.R.S. § 39-161 could apply to the documents Steinberger identifies as the basis for her claim. According to *State v. Jones*, 218 P.3d 1012, 1016 (Ariz. Ct. App. 2009), A.R.S. § 39-161 applies only to "instruments that are not genuine because they are 'false or forged.'" That is, the statute only applies to "forged" or "counterfeit" instruments; it does not apply to genuine documents that contain false statements.  Steinberger's negligence per se claim, however, is based on the alleged falsity of certain statements in the recorded documents.  Because A.R.S. § 39-161 "does not address the truth or falsity of any fact stated in an instrument," Steinberger's negligence per se theory appears to be precluded by existing law.  *Id.* at 1017.

the note, and Steinberger has been in default under the note for six years.  Therefore, viewing the evidence in the light most favorable to Steinberger, all of her contract-based claims aimed at preventing foreclosure fail.  Steinberger's other claims aimed to preventing enforcement of the note, such as unconscionability and timeliness, also fail.  And her false recording and negligence claims fail because she has not identified material errors in the recorded documents.  Deutsche Bank as Trustee is entitled to judicially foreclose.

Accordingly,

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 174) is **GRANTED**.

**IT IS FURTHER ORDERED** the Motion for Summary Judgment (Doc. 182) is **DENIED**.

**IT IS FURTHER ORDERED** within five days of this Order Deutsche Bank as Trustee shall submit a proposed form of judgment resolving all claims, counterclaims, and third-party claims.

Dated this 12th day of January, 2017.

Honorable Roslyn O. Silver
Senior United States District Judge